Ron GROSS, Sr., Guardian Ad Litem
on Behalf of Ronald GROSS, Jr., et
al., Appellants,

v.

Patrick RUNNING, et al., Defendants,

Ford Motor Company, Respondent.

No. C8–86–1703.

Court of Appeals of Minnesota.

March 31, 1987.

Review Denied May 20, 1987.

David O'Connor, Michael A. Kampmeyer, Kampmeyer & O'Connor, St. Paul, Fred Allen, Minneapolis, for appellants.

Richard A. Bowman, Janice K. O'Grady, Bowman and Brooke, Minneapolis, for respondent.

Heard, considered and decided by POPOVICH, C.J., and LANSING and RANDALL, JJ.

## OPINION

POPOVICH, Chief Judge.

This appeal is from a judgment dismissing respondent motor company from appellants' cause of action regarding defective design. Appellants claim the trial court improperly granted respondent's motion for judgment notwithstanding the verdict

because the verdict was reasonably supported by competent evidence. Respondent by notice of review challenges the trial court's failure to award it costs and disbursements and to specifically rule on its alternative motion for a new trial. We affirm.

### FACTS

In December 1979, defendant Patrick Running purchased a 1980 Ford F–150 pickup truck. He extensively used the vehicle for "four-wheeling" in rough terrain. Respondent Ford Motor Company (Ford) made the F–150 for off-road use and advertised the truck as one of Ford's "all-out tough" four wheelers. Running declined to purchase Ford's optional rear bumper because he intended to build his own custom bumper.

Four-wheeling was a common pasttime for Running and his friends William Krebs, Bruce Westlund, Cary Brown and appellant Ronald Gross, Jr. As a result, they routinely removed stuck vehicles. They commonly affixed either a nylon tow strap or a chain to the entrapped truck and towed it out using another vehicle.

During the first four months Running owned his truck, the vehicle became stuck numerous times. The truck was pulled out from the rear by attaching the tow line to either the rear-most cross member or the spring shackle mount.

In spring 1980, Running decided to mount J-hooks on his F–150 for greater ease in attaching tow straps. He purchased two hooks at the Minnesota 4–Wheel Drive Center, each accompanied by two bolts and two nuts but no washers. The hooks were neither manufactured nor distributed by Ford.

Running, Gross and Krebs together installed the hooks on Running's truck. One was attached to the front of the F–150 by inserting one bolt through a manufacturer-punched hole and the second bolt through a self-drilled hole. The second J-hook was affixed outboard on the rear of the right side framerail. One bolt was placed through a manufacturer-punched hole. No washers were used even though the framerail hole was disproportionately larger than the bolt used. An unsuccessful attempt was made to drill a second hole, and the hook was left attached by the single bolt. Part of the J-hook extended beyond the framerail's edge because of the punched hole's location.

Running had his F–150 towed from the rear J-hook on several occasions. The single bolt would loosen and Running would retighten it. The framerail visibly began to bend inboard because of leverage caused by the J-hook extending past the end of the framerail.

On August 3, 1980, Running was four-wheeling along a sandy bar when he became stuck in mud, burying his front tires. He failed at freeing the truck himself.

Krebs and Westlund attempted to tow the F–150 from the rear. Krebs attached a tow strap to the rear J-hook; Westlund placed a clevis-attached strap through a manufacturer-punched hole in the rear of Running's left framerail. Both trucks pulled together, but were unable to free Running's truck. Instead, Westlund's clevis ripped through the left framerail.

Next, a Jeep with a winch was used. After activating the winch, the Jeep began to slide toward the F–150. Trucks were then placed behind the Jeep to anchor it, but the winch was still ineffective.

Appellant Gross arrived on the scene and, after being informed of the other attempts to free Running's truck, decided he would try to free the F–150 with his 1979 Chevy four-wheel drive truck. Gross backed the rear end of his truck so it faced Running's tailgate. Although Cary Brown warned Gross about attaching the nylon strap to the rear-mounted J-hook, Gross apparently attached the strap to the hook anyway.

Gross' first pull was a tentative one, using only one tow strap. Before the second pull, a second strap was attached increasing the distance between the vehicles. For the final attempt, Gross backed up his truck which created about 15 feet of slack

in the tow strap. He then accelerated quickly, which resulted in a full-tensioning of the tow strap.

At that point, the J-hook tore through the right framerail. The tow strap's recoil effect propelled the hook through Gross' rear window at between 120 and 150 miles per hour. The J-hook impacted 20–year-old Gross' head and lacerated his brain. Appellant's injuries are severe. His speech is nonexistent and his movement is extremely limited. He can communicate limitedly by hand signal.

Appellants sued Running, Ford Motor Company, and several other defendants. Settlements were reached prior to and during trial, so that by the time the case was submitted to the jury for a verdict only Running, Ford Motor Company, and Minnesota 4–Wheel Drive Center remained. The jury returned a special verdict and apportioned fault: appellant Gross (25%); Running (35%); respondent Ford Motor Company (40%); and Minnesota 4–Wheel Drive Center (0%). The jury calculated lump sum damages to be $2,600,000.

Respondent Ford Motor Company moved for judgment notwithstanding the verdict, and in the alternative for a new trial. On July 15, 1986, the trial judge advised his court reporter that the completed post-trial order was in his computer. That evening the trial judge died, leaving the order unsigned. On August 22, 1986, appellant moved to suppress the trial court's order. That motion was denied and the order was signed by a substitute trial judge pursuant to Minn.R.Civ.P. 63.01.

The order granted respondent's motion, dismissing it from appellants' cause of action and leaving only Running as defendant. Judgment was ordered without costs or disbursements, and all other motions were generally denied. No specific disposition was made regarding respondent's new trial motion.

Appeal is made from the judgment entered September 24, 1986 dismissing respondent with prejudice. Respondent filed a notice of review challenging the trial court's denial of costs and disbursements and the trial court's failure to specifically rule on respondent's new trial motion.

## ISSUES

1. Did the trial court err in granting judgment notwithstanding the verdict?

2. Did the trial court abuse its discretion in not awarding respondent its costs and disbursements?

## ANALYSIS

1. The standard to be applied in determining the propriety of granting a motion for judgment notwithstanding the verdict is whether there is ANY competent evidence reasonably tending to support the verdict.

The trial court must base its decision on the evidence as a whole, viewing all evidence in a light most favorable to the verdict. Only where the facts are undisputed and reasonable minds can draw but one conclusion from them does the question for determination become one of law for the court.

*Thorn v. Glass Depot*, 373 N.W.2d 799, 802 (Minn.Ct.App.1985) (citations omitted), *pet. for rev. denied*, (Minn. Nov. 1, 1985). A reviewing court may not weigh the evidence nor judge the witnesses' credibility. *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn.1983).

2. Appellants claim the trial court improperly granted respondent's motion for judgment notwithstanding the verdict because competent evidence reasonably supported a conclusion that respondent Ford Motor Company is liable for defectively designing its F–150. They assert respondent did not use reasonable care because it failed to make provision for the truck to be safely towed from the rear.

The seminal Minnesota case regarding design defect is *Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984). Therein the Minnesota Supreme Court merged strict liability, negligence, and implied warranty remedies into a single theory of products liability. To recover, an injured party must show (1) the product was in a defective

condition unreasonably dangerous to the user, (2) the defect existed when the product left the manufacturer's control, and (3) causation. *See id.* at 623 n. 3. The supreme court fused a negligence standard into this traditional strict liability theory by requiring use of a reasonable care balancing test in determining whether the product was in a defective condition unreasonably dangerous. The court stated:

> [A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.
>
> What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."

*Id.* at 621 (quoting *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 385–86, 348 N.E.2d 571, 577–78, 384 N.Y.S.2d 115, 121 (1976)); *see* 4 *Minnesota Practice,* CIV. JIG III, 117 (Proposed Official Draft 1986) (JIG on which trial court based its instruction).

In granting respondent's motion for judgment notwithstanding the verdict, the trial court concluded there existed no evidentiary basis for the jury's finding the F–150 was in a defective condition unreasonably dangerous or that the product's alleged defective design was a direct cause of appellant's injuries.

### a. *Defective Condition Unreasonably Dangerous.*

Appellants claim the substantial likelihood of harm resulting from respondent's failure to design proper towing features and the gravity of harm which may result from that misdesign clearly outweigh any burden to respondent in properly designing the F–150. They assert the F–150 was clearly intended for off-the-road use and it was readily foreseeable to respondent that usage would result in the truck becoming stuck. Consequently, appellant claims respondent should have anticipated rear towing of the vehicle and provided for safe attachment of a tow hook on the truck's back end.

There can be no disagreement regarding the gravity of harm which might result from a situation involving a fully-tensioned nylon tow strap that is suddenly released to propel a metal tow hook. Expert testimony indicated the nylon strap will recoil with violent oscillation and at speeds as high as 400–500 miles per hour. The gravity of potential harm from such force is reflected by appellant's injuries.

The parties do disagree regarding the substantial likelihood of this harm occurring as a result of Ford's design of its F–150. Respondent asserts the rear of a bumperless F–150 is designed for towing. Its expert witness testified he had never seen a circumstance where the F–150 could not be extracted from the rear by attachment of a tow line to either the rear axle or the two rear shackle brackets. As example, Running's F–150 was towed from the rear on several occasions by using the vehicle's rear-most cross member or a spring shackle.

Appellants claim proper analysis concentrates on the safe rear attachment and use of a tow hook. They assert the F–150 was not designed for proper attachment or safe use of tow hook affixed to the vehicle's rear. Respondent's expert testified there was no good place on the rear segment of the F–150 frame to attach a tow hook. Yet, safe towing was possible without the tow hook as demonstrated by the facts here.

Assuming a tow hook was necessary for extrication of the vehicle from the rear, respondent argues safe use was possible if the tow hook was properly attached. Ford introduced results of pressure tests performed on tow hooks which were attached to the rear of F–150 framerails through the manufacturer-punched hole. Unlike the Running attachment, a second hole was drilled by respondent and a second bolt

used. Each bolt attachment was secured by a washer. The test data demonstrated the F–150 framerail exceeded the minimum design criteria required by appellants' expert witness.

Appellants discredit the probative value of respondent's test results by claiming it was physically impossible for Running and his friends to drill the second hole without special tools. Their expert witness also testified use of a lubricant was advisable. Nonetheless, proper equipment or assistance could have been obtained to drill the hole.

Appellants claim whatever likelihood of harm caused by the F–150's design is greatly outweighed by the minimal burden placed on respondent in using an alternative design. Appellants' expert witness testified regarding six alternative designs he believed could be easily and inexpensively used to provide for safe attachment of a tow hook to the vehicle's framerail. The expert did state on cross-examination that he had not put significant thought into the actual layout of his proposals to match the F–150 design.

The most basic remedy suggested by appellants is that respondent could at least have factory-punched a second hole to permit proper attachment of a tow hook. Appellants argue safety is not an option and claim respondent cannot delegate its duty to provide a safe place for attachment of a tow hook.

> [W]here a manufacturer introduces a finished product into the marketplace without a feasible safety device, the fact that it expects the purchaser to install that device cannot immunize it from liability. * * * [T]he manufacturer should not "leave safety to the haphazard conduct of the ultimate purchaser" and * * * the only way to ensure use of a needed safety device is to place the duty to install that device upon the manufacturer.

*Bilotta,* 346 N.W.2d at 624 (quoting *Bexiga v. Havir Manufacturing Corp.,* 60 N.J. 402, 410, 290 A.2d 281, 285 (1972)).

But as argued by respondent, no standard-sized tow hook exists. The numerous after-market hooks use various sized bolts which are spaced varying lengths apart. Selecting the size and location of a second hole would not be feasible. In addition, Ford did not punch holes for its own tow hook attachment because those holes would be obscured by Ford's bumper.

■ We conclude the trial court properly determined, based on the evidence when viewed most favorably to the jury verdict, that respondent's F–150 was not in a defective condition unreasonably dangerous to users. The F–150 framerail was strong enough to withstand minimally required pressure. Proper installation of a tow hook was feasible. Alternative designs regarding tow hook attachment were not shown as necessary or feasible. Further, it was possible to extricate the F–150 from the rear by means other than a tow hook.

#### b. *Ford's Control.*

Appellants claim the defect which caused injury existed when the F–150 left respondent's control. They assert that defect was an improperly designed vehicle which did not accommodate safe attachment of a tow hook. While Running's F–150 reached him in the same condition as manufactured by Ford, we do not agree that condition caused appellant's injuries.

#### c. *Causation.*

Appellants claim respondent's failure of safe design was the direct cause of Gross' injuries. Regarding this element, we agree with the trial court that stated:

> In summary it is clear that this accident was caused by the improper installation of an after-market product over whose use Ford had no control and by other acts of negligence by Gross and Running. Gross and Running took a soundly designed and built frame and, through their negligence, turned it into an instrumentality of injury:
>
> —they installed the J-hook with only one bolt, knowing it was supposed to have two;

—they installed the hook with the end hanging over the end of the frame rail where it could not take advantage of the structural stability of the frame;

—they failed to use washers, even though the bumper bracket hole was substantially bigger than the bolt, leaving little bearing surface between the nut and the frame;

—they continued to use the hook for jerking with nylon straps, knowing the hook was not securely attached, after it had begun to bend the end of the frame rail;

—on the day of the accident, Gross continued to use excessive and unreasonable force to attempt to extract Running's truck, even though he knew that previous attempts with two trucks together and with a winch anchored by several trucks had failed;

—Gross used the J-hook in the teeth of warnings at the site not to do so.

As respondent's tests demonstrated, the F–150 framerail would not give way under these conditions when the tow hook was properly installed with two bolts and washers. Based on the evidence, appellant's injuries were caused by the user's failure to use proper and feasible means to properly attach the tow hook and to exercise common sense in utilizing a visibly unsecure towing device.

3. Respondent claims it is entitled to its costs and disbursements in the trial court, citing Minn.Stat. §§ 549.02, .04 (1986). "Awarding of costs to the prevailing party lies within the discretion of the trial court." *Reichert v. Union Fidelity Life Insurance Co.*, 360 N.W.2d 664, 668 (Minn.Ct.App.1985).

The trial court has discretion in determining who is a prevailing party. *Id.* It not being certain under the statute whether a dismissal makes respondent a prevailing party, we conclude the trial court acted within its discretion. *See id.*

4. Given our decision judgment notwithstanding the verdict was properly granted, we do not reach respondent's argument regarding the trial court's ruling on respondent's new trial motion.

## DECISION

The trial court properly granted respondent judgment notwithstanding the verdict. The trial court did not abuse its discretion in denying respondent award of costs and disbursements.

Affirmed.