**Sharon Kay HART, as Trustee for the Heirs of James J. Hart, deceased, Respondent,**

v.

**FMC CORPORATION, a Delaware Corporation, Appellant.**

No. C9–88–2542.

Court of Appeals of Minnesota.

Oct. 3, 1989.

Review Denied Dec. 1, 1989.

Eric J. Magnuson, Rider, Bennett, Egan & Arundel, Russell A. Ingebritson, Ingebritson & Associates, Minneapolis, for respondent.

Michael W. Haag, Crassweller, Magie, Andresen, Haag, and Paciotti, P.A., Duluth, for appellant.

Heard, considered and decided by FOLEY, P.J., and RANDALL, and SCHUMACHER, JJ.

## OPINION

FOLEY, Judge.

This wrongful death action was brought by respondent Sharon Kay Hart, as Trustee for the heirs of James J. Hart, deceased, against appellant FMC Corporation and several other defendants. The other defendants settled, and the case proceeded to trial against FMC. The jury found FMC was 20% at fault and assessed damages in the amount of $1 million. The trial court ordered judgment against FMC in the amount of $200,000. Following post-trial motions, the trial court reduced this amount by $18,000, which represented 20% of the workers' compensation benefits paid by the employer prior to settlement.

FMC has appealed, contending it had no duty to warn of dangers in the system and the trial court erred in determining the amount of set-off under the collateral source statute for workers' compensation payments and the amount of prejudgment interest due. Hart has filed a notice of review, contesting the trial court's rulings with regard to FMC's contractual duties and the trial court's application of the collateral source statute. We reverse.

## FACTS

In 1977, James Hart was killed in an industrial accident at the Eveleth Taconite facility near Forbes, Minnesota. At the time, he was a senior electrician for the company. On January 31, 1977, he was informed of electrical problems on a tripper car in the crusher building. He changed a pickup shoe on the elevated electrical power source and was riding on the tripper car inspecting the electrical system. Although nobody observed the actual accident, it appears that James struck his head on an overhead platform and was killed instantly.

The tripper is a mobile car which is used in the crusher plant as part of the ore conveyor belt system. The car moves on rails, discharging ore at selected points along the length of the conveyor. The tripper is approximately 15 feet high and 55 feet long and resembles a railroad car.

In the early 1970s, Eveleth Taconite undertook a major expansion of its taconite processing facility. In 1974, FMC was invited by Eveleth Taconite and its agent, Arthur McKee and Company, to bid on the design and manufacture of two tripper cars to be used in the expansion of the processing facility. McKee's role in the expansion was to design the building alterations and additions and to specify and procure major pieces of equipment, including the tripper cars. McKee was then to coordinate construction activities, with the end result to be a completed, operating plant in compliance with all applicable codes.

When FMC was invited to bid on the tripper car contract, McKee included, with the invitation, specifications for two tripper cars and drawings of the areas where the trippers were to operate. FMC submitted a proposal in October 1974 based on the information supplied by McKee. McKee awarded the contract to FMC in February 1975.

FMC's approval drawings were submitted to McKee in April 1975. McKee and the Eveleth Taconite "Technical Committee" reviewed the drawings. McKee and Eveleth Taconite requested that FMC add a maintenance platform at the front of the tripper car for access to the tripper head

pulley and a walkway along the side to provide access to the maintenance platform. The requests were drawn on FMC's approval drawings, which were returned in May 1975 marked "approved as noted." FMC revised its drawings accordingly and returned them to McKee.

FMC then built the tripper car based on the approved drawings. The tripper was shipped to Eveleth Taconite in the spring of 1976. It was assembled and installed by ABI Contracting in the summer of 1976. McKee supervised the installation and performed a final inspection.

Shortly after installation of the tripper, an electrical engineer from McKee noticed the low clearance area that proved fatal to James. A foreman from Eveleth Taconite informed the McKee electrical engineer that signs warning of the low clearance were being prepared. Eveleth Taconite continued to operate the tripper car without incident for about six months until the accident at issue in this case.

The tripper was powered by an overhead trolley system. A boom was attached to the top of the tripper which held a group of spring loaded shoes which picked up electrical current from overhead rods. The electrical system design was independent of the design of the tripper car.

On the date of the accident, James was asked to replace an electrical contact shoe on the tripper car. After changing the shoe, he decided to ride on the tripper car's maintenance platform to inspect the operation of the electrical system. *His foreman told James to be careful of the low clearance area in question. James rode on the platform in a crouched position from one end of the building to the other. He apparently raised his head as the tripper went under an overhead structure and was killed.*

In the drawings submitted to FMC, the location of the accident showed a clearance between the maintenance platform and the ceiling of 10'11". As built, there was a clearance of 3'10½" between the platform and a low hanging beam.

The invitation for a bid sent by McKee to FMC included the following language relating to safety:

> All equipment, components, parts and accessories shall be in strict accordance with all applicable state, federal and local safety laws and codes, including but not limited to the Minnesota Industrial Commission, Minnesota Pollution Control Agency and the Bureau of Mines. (MESA)

MESA refers to the federal Mining Enforcement and Safety Administration. FMC indicated that the requirement of compliance with MESA regulations was acceptable to the company. MESA requirements would obligate FMC to consider the environment in which the tripper cars were to operate when it designed the cars.

McKee and ABI agreed in their contracts to conform to standards of the American Standards Association (now known as the American National Standards Institute). Its standard for a conveyor's conflicting with other equipment or a building provides:

> Operators shall acquire guards and maintain them in position and in safe condition, and shall acquire warning signs and maintain them in position and in legible condition. Where the combination of one manufacturer's equipment with that of another manufacturer, or with a structure creates a danger of personal injury, it will be the joint responsibility of the installer and the operator to provide suitable guards and warnings.

ANSI Standard No. 5.14.24 (1972 Ed.). This action was originally commenced against Eveleth Taconite (the name referred to Eveleth Expansion Company and Ogelbay Norton Company), McKee, ABI, FMC, and John Doe and Jane Doe. In the fall of 1986, all parties except FMC settled on the basis of a *Pierringer* release.

Following a trial to a jury, a verdict was returned in which FMC was held 20% at fault for the death of James Hart. The jury found that the tripper car was not defective, but FMC breached a duty to warn.

## ISSUES

1. Did the trial court err in submitting the question of FMC's failure to warn to the jury?

2. Did FMC have a duty to warn of the low clearance at issue?

## ANALYSIS

■ 1. The question of whether a product manufacturer has a duty to warn of a danger is a question of law for the court. *Germann v. F.L. Smithe Machine Co.*, 395 N.W.2d 922, 924 (Minn.1986). Whether a duty to warn exists is dependent on the foreseeability of the injury that results. Only if there is a specific factual dispute regarding a manufacturer's awareness of a risk should the issue be submitted to the jury for resolution. Steenson, *Products Liability in Minnesota—Design Defect and Failure to Warn Claims*, 14 Wm. Mitchell L.Rev. 443, 483–86 (1988). There is no serious factual dispute regarding the events leading up to the accident in question, and it was error for the trial court to submit the question to the jury.

■ 2. Because the question of whether a manufacturer has a duty to warn is a question of law, it is appropriate for this court to decide it. *Huber v. Niagara Machine and Tool Works*, 430 N.W.2d 465, 467 (Minn.1988). In determining whether a manufacturer has a duty to warn,

> the court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

*Germann*, 395 N.W.2d at 924. It must be foreseeable, under this standard, that the product would be used in a dangerous manner before a duty to warn will be imposed. *Huber*, 430 N.W.2d at 467.

■ It is significant in this case to observe that the jury found no defect in

FMC's design of the tripper. The basis for liability was failure to warn of hazards created by placing a non-defective chattel in a particular environment. When a manufacturer sells a non-defective chattel, the manufacturer must warn of dangers inherent in its use; however, there is no duty to warn of nonexistent dangers or of dangers that are obvious to everyone. *Minneapolis Society of Fine Arts v. Parker–Klein Associates Architects, Inc.*, 354 N.W.2d 816, 821–22 (1984); *Westerberg v. School District No. 792*, 276 Minn. 1, 10, 148 N.W.2d 312, 317 (1967).

■ In the present case, if the tripper had been used as FMC intended, there would have been no accident. The accident occurred because the plans for the building in which the tripper was to operate (and no responsibility of FMC) were changed without FMC's knowledge. FMC had a right to rely on information supplied to it by McKee and ABI.

In addition, the danger involved was made known to everyone who worked with the tripper. The foreman's testimony establishes that James was specifically warned of the low clearance hazard just minutes before his death. Any additional warning would have been of no avail, since the danger was made known to James. *See Minneapolis Society of Fine Arts*, 354 N.W.2d at 821–22; *Westerberg*, 276 Minn. at 10, 148 N.W.2d at 317 (there is no duty to warn of dangers that are obvious to anyone). Further, the tripper car was used without incident in the very same work environment for almost six months before the fatal accident.

FMC argues it could not have foreseen the circumstances that led up to James' death. The circumstances FMC cites include McKee's changing the building enclosure to create a clearance hazard which did not appear on the drawings sent to FMC; McKee's failure to notify FMC of the change; McKee's requesting a maintenance platform on the tripper car in a position which created a hazard of which McKee was aware and FMC was not; McKee's and ABI's failure to guard or warn against the clearance hazard; Evel-eth Taconite's operating the system without guards and warnings while allowing its personnel to ride on the tripper; and McKee's designing the electrical system and placing it in a position that invited workers to use the tripper as a scaffold to maintain the electrical system. We agree.

Hart argues that "the testimony of FMC's own employees established that FMC should have investigated and foreseen potential hazards with regard to pinch points when installing the tripper car." FMC did not install the tripper car; ABI installed it under supervision of McKee. Further, McKee and ABI agreed to conform to ANSI Standard No. 5.14.24, which imposes on the operator and the installer the duty to provide suitable guides and warnings. Because McKee and ABI assumed the duty to provide adequate guards and warnings, FMC had no duty to investigate and foresee potential hazards regarding pinch points.

Hart argues that if FMC had no duty to warn, a new trial should be ordered based on the trial court's evidentiary rulings regarding the contractual duties of FMC. The trial court allowed the contract documents themselves into evidence; however, none of the witnesses was permitted to testify what responsibilities were assumed by FMC under the contracts. FMC argues it should have the opportunity to introduce evidence regarding the duties undertaken by FMC pursuant to the contract.

■ Rulings on the admission of evidence are addressed to the sound discretion of the trial court. *ECI Corp. v. GGC Co.*, 306 Minn. 433, 437, 237 N.W.2d 627, 630 (1976). Such rulings are not a basis for reversal or a new trial unless abuse is clearly demonstrated. *Weiby v. Wente*, 264 N.W.2d 624, 627 (Minn.1978). Here, the trial court admitted the contracts themselves into evidence and was of the opinion that the language in the contract documents was self-explanatory. There was no abuse of discretion. Based on our disposition of the issue of FMC's duty to warn, we do not reach the other issues raised by the parties.

 

## DECISION

The trial court erred in submitting the question of FMC's duty to warn to the jury. FMC had no duty to warn of the low-clearance hazard. We reverse and order judgment dismissing the action against FMC.

Reversed.