Clyde WESTBROCK, et al., Appellants,

and

St. Paul Fire & Marine, Plaintiff in Intervention,

v.

MARSHALLTOWN MFG. CO., Respondent,

Allied–Signal, Inc., Defendant.

ALLIED–SIGNAL, INC., Defendant and Third Party Plaintiff,

v.

NOVA FABRICATING, INC., Third Party Defendant.

No. C5–90–2683.

Court of Appeals of Minnesota.

July 23, 1991.

Review Denied Sept. 13, 1991.

Robert J. King, Jr., Hvass, Weisman & King, Minneapolis, for appellants.

Michele Dale Seehafer, St. Paul, for respondent.

Kevin A. Spellacy, St. Cloud, for third party defendant.

Considered and decided by PARKER, P.J., and PETERSON and MULALLY *, JJ.

## OPINION

EDWARD D. MULALLY, Judge.

Appellants bring this appeal from the dismissal by summary judgment of their complaint in a products liability action alleging negligence in the design of a mechanical punch press; failure to provide proper safety guards; and failure to warn of potential hazards. We affirm in part, reverse in part, and remand for trial.

## FACTS

On July 28, 1986, appellant Clyde Westbrock (Westbrock), while in the course and scope of his employment with respondent/third party defendant Nova Fabricating, Inc. (Nova), was injured in an accident involving a mechanical power press manufactured by respondent Marshalltown Manufacturing Company (Marshalltown). Allied–Signal, Inc. is a successor corporation to Marshalltown. The parties contest the cause of the accident.

Marshalltown manufactured the press at issue in 1954 and included one page of instructions with a set of parts drawings. The above-mentioned instructions and drawings were not included with the press when Nova purchased the machine at a 1984 auction. The instructions and drawings contain no information or warnings concerning the need for point-of-operation guards or the need to properly maintain the press to avoid potential double-cycling injuries. Marshalltown did not equip the press with point-of-operation guards and the press did not contain any warnings regarding the need for safety guards or proper maintenance.

Roger Ebnet (Ebnet), Nova's co-owner and plant manager, supervised installation of the press. A safety device, known as a pull-back device, accompanied the press. Nova employees bolted the press to the flooring, "wired-up" the press, and attached the flywheel. Nova employees also cleaned the press of excess grease and put the machine into operation.

As installed at Nova, there were no safety devices or point-of-operation guards on the press. The pull-back device was incomplete upon delivery and apparently was never installed while the press was at Nova. The record offers conflicting evidence as to whether Ebnet and other Nova employees recognized the pull-back device as a safety device. There is no evidence Westbrock knew the pull-back existed or appreciated its function.

Nova purchased the press to perform operations necessary to complete a metal ring contract and obtained three separate operation dies needed to perform the operations. Nova employees installed the dies on the press. There apparently were no problems with using the press for the first ring contract in the fall of 1984.

---

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

There is considerable controversy surrounding the repairs and maintenance performed by Nova employees. Marshalltown argues that no single Nova employee was in charge of press repairs and maintenance. Westbrock contends Ebnet relied on the expertise of his lead pressman, Tom Scepaniak (Scepaniak), to properly maintain the press. Marshalltown contends Scepaniak only did general greasing functions.

It is undisputed that in the fall of 1984, a severe crack in the press flywheel developed. Someone removed the flywheel and heated it for several hours. It is undisputed that in the summer of 1985, the pin or the latch in the activating mechanism was removed, shaved down, and welded. Scepaniak claims Frank Malich (Malich) removed the pin and had a welder add weld to it. Malich, however, testified he took out the latch, not the pin, and it was the latch that was smoothed on one side and had weld added to it. There is also a dispute as to whether a new pin was fashioned and installed by Nova.

There is an evidentiary dispute concerning the press' double-cycling. Many employees, including Westbrock and Ebnet, claim they had no knowledge of the press double-cycling prior to Westbrock's accident. However, other employees testified the Marshalltown press double-cycled "from the day it came in."

The parties also dispute whether Scepaniak warned Ebnet or any other employees, including Westbrock, about the possibility of double-cycling. Scepaniak claims he warned Ebnet and Westbrock about the possibility of double-cycling. Westbrock testified he was unaware of any prior double-cycling before his accident. Ebnet also denied any prior knowledge of double-cycling.

Westbrock commenced this products liability action against Marshalltown alleging negligence in the design of the mechanical power press, failure to provide proper safety guards, and failure to warn of potential hazards. The trial court granted Marshalltown's summary judgment motion and dismissed Westbrock's complaint.

## ISSUES

1. Did the trial court properly conclude that the manufacturer of a multi-purpose punch press does not have a duty to provide point-of-operation guards which would necessarily impair the press' multi-function nature?

2. Did the trial court properly conclude that Marshalltown had no duty to warn Westbrock of the risks of lack of point-of-operation guarding and improper maintenance, repair, or alteration?

3. Did the trial court properly find no causal connection between Marshalltown's failure to warn and Westbrock's injuries?

4. Did the trial court properly find that Nova's lack of maintenance and alterations to the punch press constituted a superseding cause of Westbrock's injuries?

## ANALYSIS

### Standard of Review

On appeal from summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988); *Olson v. Ronhovde*, 446 N.W.2d 690, 691 (Minn.App.1989); Minn. R.Civ.P. 56.03. The trial court may not decide factual issues via summary judgment, and its sole function is to determine whether factual issues exist. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981). The evidence must be viewed in the light most favorable to the party against whom summary judgment was granted, and "[a]ll doubts and factual inferences must be resolved against the moving party." *Id.*

The Minnesota Supreme Court has repeatedly held that "summary judgment is proper when the nonmoving party fails to provide the court with specific facts indicating that there is a genuine issue of fact." *Hunt v. IBM Mid America Employees Fed. Credit Union*, 384 N.W.2d 853, 855 (Minn.1986) (citing *Erickson v. General United Life Ins. Co.*, 256 N.W.2d 255, 258–59 (Minn.1977)). To successfully oppose a

summary judgment motion, a party cannot rely upon mere general statements of fact, but rather must demonstrate at the time the motion is made that specific facts create a genuine issue for trial. *Id.* (citing *Borom v. City of St. Paul*, 289 Minn. 371, 374, 184 N.W.2d 595, 597 (1971)).

## POINT–OF–OPERATION GUARDS

1. *Design Defects and Optional Safety Mechanisms*

### a. *Duty*

■■■ Westbrock contends Marshalltown had a duty to provide point-of-operation safety guards on its press. Marshalltown argues the press' multi-purpose nature precluded installation of a single safety device which would not impair the machine's multi-function nature. Marshalltown argues it had no duty as a matter of law to provide point-of-operation guards. We agree with the trial court that based on the evidence presented, Marshalltown had no duty to provide point-of-operation guards for this multi-function power press.

Minnesota has adopted the general rule that a manufacturer's duty to design and manufacture a reasonably safe product may not be delegated. *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 624 (Minn.1984). *Bilotta* merged strict liability, negligence, and implied warranty remedies into a single products liability theory. To recover, an injured party must show (1) the product was in a defective condition, unreasonably dangerous to the user, (2) the defect existed when the product left the manufacturer's control, and (3) causation. *Id.* at 623 n. 3. The supreme court fused a negligence standard into a traditional strict liability theory by employing a reasonable care balancing test to determine whether the product was defective. The court stated:

[A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.

What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."

*Id.* at 621 (quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385–86, 348 N.E.2d 571, 577–78, 384 N.Y.S.2d 115, 121 (1976)).

The critical issue raised in *Bilotta* and relevant to this case is whether a product manufacturer may shift responsibility for design selection to an intermediary. The *Bilotta* defendant argued that shifting responsibility to the purchaser would encourage the development and purchase of safety options. *Bilotta*, 346 N.W.2d at 624. The argument was based on an earlier Eighth Circuit decision, *Wagner v. Int'l Harvester Co.*, 611 F.2d 224 (8th Cir.1979). *Wagner* characterized the option offer defense rationale:

[T]he purchaser of multi-use equipment knows best the dangers associated with its particular use, and so it should determine the degree of safety provided. That is to say, the purchaser may be in the best position to make the cost-benefit analysis implicit in the principles of general negligence. Imposing liability on such a purchaser would result in minimizing the sum of accident and preventative cost.

*Id.* at 231. The Eighth Circuit accepted the theory, but found it inapplicable to the case's facts. *Id.*

*Bilotta* noted the *Wagner* rule would "be justified only [in cases] where multi-use equipment is involved and the optional device would impair the equipment's utility in the uses for which the device is unnecessary." *Bilotta*, 346 N.W.2d at 624. However, the court concluded: "The better rule, which we hereby adopt, is that a manufacturer may not delegate its duty to design a reasonably safe product." *Id.*

The supreme court based its nondelegable duty determination on a New Jersey Supreme Court punch press case, *Bexiga v. Havir Mfg. Corp.*, 60 N.J. 402, 290 A.2d 281 (1972). *Bexiga* concluded:

Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can *feasibly* be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. * * * The only way to be certain that such devices will be installed on all machines—which clearly the public interest requires—is to place the duty on the manufacturer where it is *feasible* for him to do so.

We hold that when there is an unreasonable risk of harm to the user of a machine which has no protective safety device, as here, the jury may infer that the machine was defective in design *unless it finds that the incorporation by the manufacturer of a safety device would render the machine unusable for its intended purposes.*

*Id.* at 410–11, 290 A.2d at 285 (emphasis added).

The Minnesota Supreme Court relied upon this language in reaching its final conclusion that:

The suggested option offer defense thus would not apply to dockboards which are not multi-use and whose functioning is never impaired by the installation of the panic stop device.

*Bilotta,* 346 N.W.2d at 624. The *Bilotta* dockboard did not satisfy the "suggested option offer defense" because the dockboard was not multi-use and its function would not have been impaired by installation of a panic stop device. *Id.* at 624.

Although *Bilotta* rejected the *Wagner* option offer defense, adoption of *Bexiga's* nondelegable duty rule does not imply automatic manufacturers' liability. The circumstances under which the manufacturer made a decision to design and market a product will be relevant in determining whether the manufacturer exercised reasonable care. Furthermore, coupled with the supreme court's strong statement concerning the practical necessity of proving a feasible alternative in *Kallio v. Ford Motor Co.,* 407 N.W.2d 92, 96–97 (Minn.1987), a product may be sufficiently safe if a device could not feasibly be installed in a multi-purpose machine without impairing the machine's multi-purpose nature.

This court has previously noted that a safety device defense may apply when the product is multi-purpose and any single safety device would impair the equipment's utility. *See Gross ex rel. Gross v. Running,* 403 N.W.2d 243, 247 (Minn.App. 1987), *pet. for rev. denied* (Minn. May 20, 1987) (truck manufacturer had no duty to provide a safe place for attachment of a tow hook absent standard-sized tow hook); *Dahlbeck v. DICO Co., Inc.,* 355 N.W.2d 157, 163 (Minn.App.1984) (manufacturer of multi-purpose switch not requiring further safety precautions did not have a duty to warn truck manufacturer which incorporated switching controls with crane).

We therefore reject Westbrock's claim that *Bilotta* creates a nondelegable duty to provide point-of-operation guards in this case. A thorough reading of *Bilotta* indicates why Westbrock's argument fails. *Bilotta* did not reject the optional safety device defense where a multi-purpose machine would be impaired by application of a standard safety device. *Bilotta* merely found that the dockboards in that case were not multi-functional and a standard safety device would not have impaired the machine's operation. *Bilotta,* 346 N.W.2d at 625. Other jurisdictions which have considered this narrow issue have reached similar conclusions. *See Johnson v. Niagara Mach. & Tool Works,* 555 So.2d 88, 92 (Ala.1988); *Verson Allsteel Press Co. v. Garner,* 261 Ark. 133, 140–143, 547 S.W.2d 411, 415–16 (Ark.1977); *Savage Mfg. & Sales, Inc. v. Doser,* 184 Ill.App.3d 405, 408, 132 Ill.Dec. 662, 664, 540 N.E.2d 402, 404 (Ill.App.Ct.1989); *see also Gordon v. Niagara Mach. & Tool Works,* 574 F.2d 1182, 1189–90 (5th Cir.1978); *Hardy v. Hull Corp.,* 446 F.2d 34, 35–36 (9th Cir. 1971).

Westbrock cites foreign decisions which hold a multi-purpose punch press manufacturer may not delegate the duty to guard

to the press' users. *See Rhoads v. Service Mach. Co.*, 329 F.Supp. 367 (E.D.Ark.1971); *Soto v. E.W. Bliss Div. of Gulf & W. Mfg. Co.*, 116 Ill.App.3d 880, 72 Ill.Dec. 319, 452 N.E.2d 572 (Ill.App.Ct.1983); *Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404 (Mo.Ct.App. 1983). However, in all the cases cited by Westbrock, the plaintiffs produced at least some evidence of safety devices which would not defeat the multi-purpose nature of a multi-function punch press. In contrast, Marshalltown supplied evidence the press was multi-functional and that different point-of-operation guards were required for each set of dies. In particular, Peter Theisen (Theisen), a punch press expert and the machine's subsequent purchaser, testified the guards had to be specially designed for each job. Theisen also opined that any single guard would be inappropriate for all punch press functions. Unlike the cited cases, Westbrock did not produce any evidence the punch press was uni-functional or that a single safety device could have been used without irreparably sacrificing the machine's multi-functional nature. In fact, Westbrock's reply brief referred to the press as "multi-purpose."

Marshalltown is therefore entitled to summary judgment because, based on the evidence provided, it had no duty to provide guards for a multi-purpose press where any single point-of-operation guard would impair the machine's multi-purpose utility. This analysis is consistent with the suggestion in *Bilotta* and *Bexiga* that the safety device defense is available to manufacturers of multi-purpose products not susceptible to a single standardized safety device.

### b. *ANSI/OSHA Standards*

■ Westbrock criticizes the trial court's reference to punch press standards created by the American National Standard Institute (ANSI) and the Occupational Safety and Health Administration (OSHA). ANSI and OSHA standards state that the method of guarding a multi-purpose press depends upon the method of feeding and injecting the finished part. The standards impose the duty to select a proper guarding on the press' user or purchaser. Westbrock contends the trial court improperly relied on ANSI and OSHA standards in contradiction to Minnesota case law.

Westbrock's argument is unpersuasive. The trial court did not substitute ANSI and OSHA standards for case law duty analysis. The trial court merely noted the nature of point-of-operation guarding for punch presses. The trial court's analysis hinged on factually distinguishing *Bilotta*'s nondelegable duty rule rather than the ANSI/OSHA standards.

### 2. *Duty to Warn*

■ Westbrock argues Marshalltown had a duty to warn him against using the press without proper safety guards and the danger of double-cycling associated with improper maintenance. Marshalltown suggests that as a component part manufacturer, it had no duty to warn Westbrock. *See Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 468 (Minn.1988). The trial court implicitly found the press was a component part and therefore, under *Huber*, Marshalltown had no duty to warn.

The question of whether a product manufacturer has a duty to warn of a danger is a question of law for the court. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.1986); *Hart v. FMC Corp.*, 446 N.W.2d 194, 197 (Minn.App.1989), *pet. for rev. denied* (Minn. Dec. 1, 1989). Whether a duty to warn exists is dependent on the resulting injury's foreseeability. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987). Duty to warn consists of the duty to give adequate instructions for safe use and to warn of dangers inherent in improper usage. *Frey v. Montgomery Ward & Co., Inc.*, 258 N.W.2d 782, 787 (Minn.1977). Failure to warn is a cause of action separate from defective design, either on a strict liability or on a negligence theory. *Peppin v. W.H. Brady Co.*, 372 N.W.2d 369, 374 (Minn.App.1985). However, questions of a warning's adequacy, breach and causation are usually jury questions. *Balder*, 399 N.W.2d at 81.

In *Germann*, the supreme court set the standard for determining a manufacturer's duty to warn:

[T]he court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

*Germann,* 395 N.W.2d at 924. *Germann* held that a press manufacturer had a duty to warn operators of the danger of using its press without a properly attached and operating safety bar. *Id.* at 925. *Germann* relied on the fact that the press was delivered by the manufacturer unassembled and a safety bar was removable. *Id.* *Germann* noted that the press design required that the safety bar be removed periodically to service the machine with the attendant risk that it might not be reattached properly. *Id.*

As in this case, *Huber* recognized the OSHA requirement that:

> It shall be the responsibility of the employer to provide and insure the usage of "point-of-operation guards" or properly applied and adjusted point-of-operation devices on every operation performed on a mechanical power press.

*Huber,* 430 N.W.2d at 468 (citing 29 CFR § 1910.217(c) (1987)). The court noted that even if the manufacturer's foot switch rendered certain safety devices ineffective, "it was the responsibility of the employer to insure that other point-of-operation guards were installed on the press itself." *Id.* *Huber* held the manufacturer of a foot switch, as a component manufacturer, had no duty to insure use of such safety devices. *Id.* However, in a footnote, the court cautioned:

> This reasoning does not conflict with our prior decisions establishing that the manufacturer of a finished product has a duty to warn ultimate users of dangers presented by its product and this duty may not be delegated to an intermediary.

*Id.* at 468 n. 2.

We conclude *Huber* does not control this case. *Huber* limited its analysis to compo-nent parts and did not discuss the distinction between component parts and finished products. *Huber* involved a punch press foot switch manufacturer and the court's analysis assumed the switch was not a finished product. Although not discussed in *Huber,* the case briefs suggest the foot switch had multiple implementations unrelated to punch presses.

We recognize that other jurisdictions have at least implicitly indicated that a punch press is a component part of a press system. *See Bautista v. Verson Allsteel Press Co.,* 152 Ill.App.3d 524, 530, 105 Ill. Dec. 487, 491, 504 N.E.2d 772, 776 (Ill.App. Ct.1987) (evidence revealed the machine was a power component of a manufacturing system and it was sold without dies and had no point-of-operation to be guarded against); *Vilar v. E.W. Bliss Co.,* 134 Mich.App. 116, 120, 350 N.W.2d 920, 922 (Mich.Ct.App.1989) ("The press at issue here could only be used in conjunction with dies, a power source, and some method of feeding materials into the press, whether manual, semi-automatic, or automatic. The press was harmless and inoperable unless incorporated into such a system."). However, in this case, Marshalltown failed to produce any evidence that this particular press was merely a component of a larger punch press system. Marshalltown did not submit a single expert affidavit or any technical drawings regarding the characteristics of this specific press. On the bare record before us, we cannot identify the press as a component part in any meaningful way. Therefore, *Huber* is not dispositive of Westbrock's failure to warn claim.

### 3. *Causation*

■ As an additional basis for summary judgment, the trial court found as a matter of law no causation between the failure to warn and Westbrock's injuries. The trial court's causation analysis relied on its factual finding that Ebnet knew the machine double-cycled. The trial court speculated that Ebnet would have ignored any additional manufacturer warnings.

**360**

Ebnet denied knowledge of the double-cycling before the accident.

Initially, we note that failure to warn causation issues involve fact questions usually left for the trier of fact. *Balder,* 399 N.W.2d at 81; *Todalen v. United States Chem. Co.,* 424 N.W.2d 73, 78 (Minn.App.1988), *pet. for rev. denied* (Minn. June 29, 1988). The trial court's causation analysis involved findings of disputed facts. There is no evidence Westbrock would have operated the press without guards in the presence of a warning. The trial court's conclusion that Ebnet would have ignored the warnings is not determinative of Westbrock's conduct.

### 4. *Superseding Causation*

As a final basis for summary judgment, the trial court concluded that Nova's negligence in not providing safety guards and performing substantial alterations to the press constituted a superseding cause of Westbrock's injuries. Westbrock argues Nova's actions present factual issues rather than superseding causation as a matter of law.

A cause is "superseding" if four elements are established:

(1) Its harmful effects must have occurred after the original negligence;

(2) it must not have been brought about by the original negligence;

(3) it must actively work to bring about a result which would not otherwise have followed from the original negligence; and

(4) it must not have been reasonably foreseeable by the original wrongdoer.

*Regan v. Stromberg,* 285 N.W.2d 97, 100 (Minn.1979) (quoting *Kroeger v. Lee,* 270 Minn. 75, 78, 132 N.W.2d 727, 729 (1965)). Negligence and direct cause generally are factual questions for the trier of fact. *See Hafner v. Iverson,* 343 N.W.2d 634, 638 (Minn.1984). However, superseding cause issues may be determined by the court if the facts are sufficient. *See Hedlund v. Hedlund,* 371 N.W.2d 232, 236 (Minn.App. 1985).

As discussed previously, Nova apparently violated certain OSHA regulations. However, Minnesota courts have held that an employer's violation of statutory duties does not necessarily constitute a superseding cause as a matter of law. *See Bilotta,* 346 N.W.2d at 625 (OSHA violations "were reasonably foreseeable" and therefore not a superseding cause relieving a manufacturer of its duty to produce a safe product); *Keenan v. Hydra–Mac, Inc.,* 422 N.W.2d 741, 745 (Minn.App.1988) (although skidsteer loader operator was working in violation of the Child Labor Standards Act, operator would not have been injured if the loader were designed properly or fitted with a seat control interlock device), *rev'd on other grounds,* 434 N.W.2d 463 (Minn. 1989).

Undisputed evidence indicates Marshalltown knew the importance of using safety mechanisms and proper maintenance. Marshalltown could certainly foresee that an employer might not provide appropriate safety mechanisms or proper maintenance. More importantly, there are disputed factual issues concerning Nova's conduct. We conclude that Nova's OSHA violations and poor maintenance do not entitle Marshalltown to summary judgment as a matter of law.

The trial court's superseding analysis relied on *Rients v. International Harvester Co.,* 346 N.W.2d 359 (Minn.App.1984), where this court upheld summary judgment for a manufacturer in a defective design action. Failure to warn is a cause of action separate from defective design theories. *Peppin,* 372 N.W.2d at 374. *Rients* did not address subsequent alterations and modifications in a failure to warn context and does not control our decision.

### DECISION

We affirm summary judgment for Marshalltown in the defective design action. We reverse summary judgment in Westbrock's failure to warn claims and remand for trial.

Affirmed in part, reversed in part, and remanded.