Albert J. BILOTTA, Jr., et al.,
Respondents,

v.

KELLEY COMPANY, INC., et
al., Appellants.

No. CX–82–186.

Supreme Court of Minnesota.

March 16, 1984.

Richard Baldwin, John F. Cook, St. Paul, for appellants.

John V. Norton, Minneapolis, Thomas M. Mooney, St. Paul, John S. Schomburg, Minneapolis, for respondents.

WAHL, Justice.

Albert J. Bilotta, Jr., suffered severe and permanent brain damage as the result of an industrial accident December 5, 1977. He was pinned at the neck against a door-jamb when a forklift truck tipped over onto him at a warehouse loading dock. He filed this lawsuit through his special guardian, alleging strict liability, negligence and breach of warranty against ELCA Enterprises (ELCA), the owner of the warehouse, Rauenhorst Corporation (Rauenhorst), the contractor who built the ware-

house, Robert R. Pugleasa Company (Pugleasa), the distributor of the dockboard, and Kelley Company (Kelley), the manufacturer of the dockboard. Kelley then commenced a third-party action against Safelite Industries (Safelite), the lessee of the warehouse, two of Safelite's employees, Michael P. McGrath and Dan Selley, Labor Pool, Inc., which sent Bilotta to the warehouse as day labor, and finally, Allis-Chalmers Corporation (Allis-Chalmers), the manufacturer of the forklift truck.[1]

Following a 7-week trial, the jury was given a special verdict form which asked, among other questions, whether the dockboard was defective and unreasonably dangerous when it left the Kelley Company and whether Kelley, ELCA, Rauenhorst, and Safelite were negligent. The jury returned a verdict finding Kelley strictly liable and finding Kelley, Safelite, and Pugleasa negligent. It attributed 50% of the liability to Kelley, 40% to Safelite, and 10% to Pugleasa and assessed $2,300,000 in damages.

Kelley appeals from the trial court's denial of its post-trial motions for a JNOV or a new trial on the grounds of erroneous jury instructions, insufficient evidence of causation, and irreconcilable apportionment of liability.

A. *The Product*:

Dockboards are used to bridge the gap between a loading dock and a carrier bed. Personnel and various types of forklift trucks then maneuver across the board to load or unload the carrier. Ninety percent of all dockboards are portable plates that are manually placed over the gap. The other ten percent are either mechanical or hydraulic operations.

Mechanical dockboards are operated by raising the ramp component and extending a hinged lip onto the carrier bed. They are installed over a recessed pit, giving the dockboard a capability of accommodating carrier beds either above or below the dock

level. When not in use, the lip returns to a pendant position and the ramp is supported at dock level by steel legs underneath the ramp at each side.

When in use, a dockboard is supported on one side solely by the carrier bed. Thus, a major hazard at loading docks is that the carrier may become separated from the lip extension, leaving the dockboard without support on one side, perhaps with equipment and/or personnel on the dockboard at the time. This can occur either (1) if the semi truck pulls or rolls away with a load on the ramp or (2) if the angle of the lip is too steep for a forklift truck to ascend, in which case the forklift's drive wheels, upon hitting the lip, effectively push the carrier away from the dock.

In addressing the first hazard, Kelley's competitors universally employ a fixed safety leg, which prevents the dockboard from falling below dock level should the semi truck pull away. Kelley claims, however, that such a system in itself exacerbates the second hazard of the forklift pushing away the carrier. It claims that truck deflection from the weight of the load and forklift may cause the lip to drop below ramp level, while the fixed leg prevents the ramp from following the lip. The forklift driver either will not notice the deflection and resultant steep lip angle or will not bother to stop and manually adjust the legs.

Kelley addressed the hazard associated with truck deflection by its patented "cross-traffic legs." Upon raising the ramp, the lip automatically flips up. The lip flip in turn cams the safety leg into a retracted position. In this way the ramp and lip can "float" together up and down with the deflection of the carrier bed, thus preventing the creation of an angle dangerous to forklift operation. Without a load on the dock, the ramp would raise by its own upward bias, the lip would drop, and

---

1. Bilotta received several pre-trial settlements. Only Kelley and Allis-Chalmers went to trial in October. After the close of plaintiff's case, the court granted Allis-Chalmers' motion to dismiss Kelley's claims against it.

the cam would return the legs to their fixed position for support at dock level.

The cross-traffic leg, however, left the first hazard unaddressed. If the carrier pulled or rolled away while a heavy load was on the dock, there would not be time for the lip to drop and cam the safety legs into position, and thus the dockboard would fall to its lowest position. To prevent this occurrence, Kelley's engineers developed a "panic stop." This patented device is a notched post which "senses" the ramp's speed of descent and can catch a fall within 3 inches. Thus, Kelley's two patented devices corrected both hazards when used in combination, while its competitors addressed only one hazard.

Kelley's dockboards are priced above its competitors' models. In order to compete, Kelley offered both the fixed-leg safety system and the cross-traffic leg system, for which it offered a panic stop as a $200 option.

In 1970, Kelley developed Model 6280, which is a contractors' dockboard. It was "self-forming" in that it came equipped with a steel pan around which concrete for the dock was poured, thereby saving time and installation costs. It had a smaller recessed pit than the other mechanical model, Model 6081. Because of this, use of the panic stop in Model 6280 would require additional installation steps and would increase the per-unit price by several hundred dollars, to almost equal the price of the 6081, a larger and higher-capacity board. Thus the 6280 was not marketed with a panic stop, but it did have retractable cross-traffic legs.

In 1971, the contractor for Safelite's Eagan warehouse, Rauenhorst, specified the Model 6081 with panic stops for its loading docks. To meet anticipated competitive bids, Pugleasa, Kelley's distributor, requested and received permission to submit alternative bids. Pugeasa's submitted bid on the 6280 contractors' boards, without panic stops, was eventually accepted to save time and costs in construction.

**2.** There was testimony that this happens occasionally due to the difficulty in removing pallets

## B. *The Accident.*

On December 5, 1977, Albert Bilotta, age 20, went to Labor Pool to request work and was sent to the Safelite warehouse with another man, Keith Meyer. They were assigned general clean-up chores near the loading dock. Meanwhile, Mike McGrath, a Safelite employee, was unloading pallets from a semitrailer with a forklift truck. He was using the Kelley dockboard a few inches above dock level. After this point, accounts of what happened vary substantially. It is clear that the forklift became stuck somehow, its right wheels on the dock and its left wheels on the raised ramp, and that McGrath could not move it.[2]

Unable to free the forklift, McGrath conferred with the semi driver, Dan Selley, and told him to pull the semi out. Selley pulled out about 15–20 feet. This removed the dockboard's support, and the ramp fell to its lowest position under the weight of the forklift truck. Somehow, Bilotta became backed up against the warehouse doorjamb and was pinned there at the neck when the forklift truck tipped over onto him.

Bilotta was trapped by the forklift for several minutes before paramedics were able to release him. As a result, his brain was deprived of oxygen and he suffered severe and permanent brain damage.

Kelley's appeal raises the following issues:

1. In a conscious design-defect case, are instructions adequate when they fail to direct the jury to consider the factors which a manufacturer must consider in producing its product?

2. Were the instructions adequate when they failed to state that warnings are not required for obvious dangers?

3. Does the offer of an optional safety device, without which the product is unreasonably dangerous, relieve the manufacturer from liability as a matter of law?

from the inside corners of the carrier nearest the dock.

4. Was it error for the trial judge to instruct the jury on express warranties?

5. Did the trial court err in failing to instruct the jury on superseding cause?

6. Is the expert testimony on causation sufficient to support the verdict against appellant?

7. Was the jury verdict irreconcilable?

1-2. In instructing the jury on conscious design defect, the trial court submitted the following instruction based on JIG II 118, 4 Minn. Dist. Judges Ass'n, Minnesota Practice JIG II Civil (2d ed. 1974) (hereinafter JIG II):

> A product is in a defective condition if, at the time it leaves the seller's hands, it is in a condition which is unreasonably dangerous to the ordinary user.

> A condition is unreasonably dangerous if it is dangerous when used by an ordinary user who uses it with the knowledge common to the community as to the product's characteristics and common usage.

> The defect may be in the design of the product itself or in the instructions necessary for its safe use.

This instruction follows the Restatement (Second) of Torts § 402A (1965); the second paragraph of this instruction is commonly called the "consumer expectation" standard.

Appellant argues that JIG II 118 does not present its theory of the case, since its defense was based on the reasonableness of its decision not to incorporate a panic stop as a standard feature in the contractors' board Model 6280. Appellant introduced evidence of the high cost of the panic stop option and consequent decreased marketability of the board with the option. The utility of the board—its quick and more simple installation—would be impaired by the requisite additional steps for installing a panic stop. Appellant also produced evidence for the claim that its model eliminated the more dangerous and frequently occurring hazard associated with the fixed-leg system. Appellant argues that the trial court effectively instructed

the jury to disregard this evidence by directing it to focus only on the expectation of the product's user.

The question presented, then, is whether JIG II 118 is adequate guidance for a jury assessing an alleged design defect. This question must be discussed in light of *Holm v. Sponco*, 324 N.W.2d 207 (Minn. 1982). *Holm* presented a challenge to the patent defect doctrine, adopted in Minnesota in the case of *Halvorson v. American Hoist & Derrick Co.*, 307 Minn. 48, 240 N.W.2d 303 (1976). Following the rule laid out in *Halvorson*, the trial court in *Holm* granted summary judgment for the manufacturer since the design defect involved there was obvious, known of by the user, and warned against by the manufacturer. On appeal, we overruled *Halvorson* and reversed and remanded for trial on the theories of strict liability and negligence.

In overruling *Halvorson*, we adopted in its place a reasonable-care balancing test and quoted with approval the definition of that test set out by the Court of Appeals of New York:

> [A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.

> What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."

*Holm v. Sponco*, 324 N.W.2d at 212, quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385–86, 348 N.E.2d 571, 577–78, 384 N.Y. S.2d 115, 121 (1976) (citations omitted).

█ Appellant contends that an instruction based on the consumer expectation standard does not adequately reflect the manufacturer's duty of care that we adopted in *Holm*. We agree. JIG II 118 was formulated for the qualitatively differ-

ent product defect of inadvertent manufacturing flaws. In such a case an objective standard exists—the flawless product—by which a jury can measure the alleged defect. Thus, in manufacturing-flaw cases, the defect is proved by focusing on the condition of the product. The JIG II 118 consumer expectation instructions, which focus only on the condition of the product, are appropriate for this type of case, since the manufacturer's conduct is irrelevant.

In a design-defect case, however, there is no doubt that the product is in the condition intended by the manufacturer. In such a case, the "defect" lies in a consciously chosen design. The manufacturer has deliberately added or omitted the challenged component and has presumably made that decision after balancing a variety of factors. A jury must, appellant contends, be told to weigh these same factors and decide whether the risk-utility balance struck by the manufacturer was or was not reasonable. In *Holm v. Sponco*, we adopted as an objective standard the reasonable care balancing test, which focuses on the conduct of the manufacturer in evaluating whether its choice of design struck an acceptable balance among several competing factors.

We agree with appellant that, after *Holm*, a jury instruction based on the consumer expectation standard no longer presents an adequate statement of the law on design defect. While JIG II 118 correctly defines "defective" as unreasonably dangerous and states that a defect may exist in either the design of a product or warnings and instructions for its use, the jury must be instructed, in addition, on the manufacturer's duty to produce a safe product. We therefore adopt as additional instructions, to be substituted for the consumer expectation standard, set out in paragraph 2 of JIG II 118, the definition of that duty quoted above from *Micallef*, which we approved in *Holm*.

It has been suggested by commentators that, while strict liability and negligence are distinct theories in manufacturing flaw cases, they actually merge into one theory for consideration of design-defect cases. *See* Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, (1973); Steenson, *The Anatomy of Products Liability*, 6 Wm. Mitchell L.Rev. 1, 23–25 (1980); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 849–51 (1973). Similarly, we have recognized that failure-to-warn claims are based on a concept of negligence. *Westerberg v. School District No. 792*, 276 Minn. 1, 9–11, 148 N.W.2d 312, 316–18 (1967). The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory. Steenson, 6 Wm. Mitchell L.Rev. at 25, 40. In *Halvorson* we reversed as irreconcilable a jury verdict finding the defendant negligent but not strictly liable, reasoning that the finding of a defect, necessary to strict liability, was also an element in a finding of negligence. Since the jury had found for defendant on strict liability, the broader theory in that case, it could not consistently render a verdict for plaintiff on the more restrictive theory. In *Bigham v. J.C. Penney Co.*, 268 N.W.2d 892 (Minn.1978), however, the same type of verdict was upheld on appeal because the jury instructions given rendered negligence the broader theory of recovery. The strict liability instructions required the jury to assess a defect dangerous to the ordinary consumer, whereas plaintiff's work subjected him to fire hazards. *Id.* at 897. Thus, while the failure to warn of the flammable characteristics of the clothing was negligent as to the plaintiff, those characteristics did not necessarily render the clothing defective and unrea-

sonably dangerous toward an ordinary consumer not exposed to unusual fire hazards.

 Thus, we note that, assuming proper instruction to ensure the broadest theory of recovery, a trial court could properly submit a design-defect or failure-to-warn case to a jury on a single theory of products liability. Submission of a single theory of recovery may avoid the confusion and inconsistent verdicts spawned by submission of multiple overlapping theories without restricting a plaintiff's ability to benefit from the elements of proof which make strict liability a broader theory of recovery than traditional negligence.[3] *See Holm v. Sponco*, 324 N.W.2d at 214 (Simonett, J., dissenting in part).

 Appellant insists that, because the design-defect instructions given by the trial court were inadequate, we must grant a new trial. The general rule is that, where several issues were submitted, an erroneous instruction on one issue was given and a general verdict is returned, a new trial is required. *General Electric Co. v. Florida & Southern Dredging Co.*, 183 Minn. 178, 181, 235 N.W. 876, 877 (1931). Two interrogatories were submitted to the jury with respect to appellant, one on strict product liability, one on negligence. These interrogatories read: "At the time the Model 6280 dockboard left Kelley Company, Inc. was it in a defective and unreasonably dangerous condition?" and "Was Defendant Kelley Company, Inc. negligent?" Even if one concedes that the interrogatories submitted could cover both a design-defect claim and a failure-to-warn claim, the fact remains that the trial court gave an erroneous and incomplete instruction on the design-defect claim. Consequently, it is impossible to determine whether the jury answered the interrogatories relying on the court's instructions with respect to the design defect or with respect to appellant's alleged failure to warn.

 The findings on the interrogatories under the circumstances of the submission of this case were equivalent to a general verdict. That the jury was confused on the issues is clear in the jury's request to the court "to have some further instructions as to the law pertaining to defective and unreasonably safe." In response, the court merely reread the entire original instructions, which contain the erroneous instruction on design defect and inappropriate instructions with respect to warranty. The reason for the rule requiring a new trial is that a reviewing court has no way to ascertain whether the jury's verdict was predicated upon the erroneous instruction or upon a different theory on which the trial court did correctly instruct. In the instant case, we have no way of knowing on what theory the jury arrived at its answer to the liability interrogatories with respect to appellant. Nor can we conclude that respondent was entitled to the verdict, because, as a matter of law, appellant breached its duty to give reasonable warning of the defect. *Cavallero v. Travelers Insurance Co.*, 197 Minn. 417, 424, 267 N.W. 370, 373–74 (1936). Under the circumstances of this case, whether appellant could have reasonably foreseen or anticipated that dockworkers would fail to comprehend the dangers of a dockboard falling upon movement of a truck-trailer bed away from the dock was a jury question. *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 786 (Minn.1977). A new trial is required on the issue of liability.[4] The issue

---

3. In order to recover under the theory of strict liability, the plaintiff must establish (1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained. *Lee v. Crookston Coca-Cola Bottling Co.*, 290 Minn. 321, 329, 188 N.W.2d 426, 432 (1971).

4. Respondent argues strongly, on petition for rehearing, for prospective application of the rule of law we have adopted on design-defect instruction. The general rule is to give retroactive effect to judicial decisions in the area of substantive tort law. *American Family Mutual Insurance Co. v. Ryan*, 330 N.W.2d 113, 115 (Minn.1983); *see also* "Retroactivity of Personal Injury Decisions," 6 Wm. Mitchell L.Rev. 179, 185 (1980). Finding no supportable reason to

**624**

of damages was fully and fairly litigated and need not be retried.

3. Appellant next urges this court to adopt a rule whereby the offer of safety devices to knowledgeable purchasers passes to the purchaser the risk of loss from use of that product without the device. We reject this proposal, for the reasons developed below, as inconsistent with the manufacturer's duty to produce a reasonably safe product.

Appellant argues that passing the liability on to the purchaser will encourage the development and purchase of safety options. Appellant would limit this defense to situations where (1) the purchaser is aware of both the hazard and the available option, (2) the operator could have avoided the accident through use of the due care, (3) the possibility of the accident is statistically minimal, and (4) the option was a feature beyond that normally provided by the industry. Appellant cites *Wagner v. International Harvester Co.*, 611 F.2d 224, 231 (8th Cir.1979), in support of its argument. In *Wagner*, the manufacturer argued that it had satisfied its duty of reasonable care by making available a rollover protection device for a crawler. The court stated the option theory in this way: "[A] purchaser of multi-use equipment knows best the dangers associated with its particular use, and so it should determine the degree of safety provided." *Id.* The court stated that it accepted the theory as "basically sound" but found it inapplicable to the facts before it, where the device had been marketed as an overhead protection, rather than a rollover, device. *Id.*

The rule cited in *Wagner* and adopted by the court in *Biss v. Tenneco, Inc.*, 409 N.Y.S.2d 874, 64 A.D.2d 204 (1978), can be justified only where multi-use equipment is involved and the optional device would impair the equipment's utility in the uses for which the device is unnecessary.

 The better rule, which we hereby adopt, is that a manufacturer may not delegate its duty to design a reasonably

safe product. *Turney v. Ford Motor Co.*, 94 Ill.App.3d 678, 50 Ill.Dec. 85, 418 N.E.2d 1079 (1981); *Shawver v. Roberts Corp.*, 90 Wis.2d 672, 280 N.W.2d 226 (1979). The policy behind this rule is stated in *Bexiga v. Havir Manufacturing Corp.*, 60 N.J. 402, 290 A.2d 281 (1972). In *Bexiga*, safety devices for both small and large punch presses were available but were sold as standard equipment only on the large presses. One available safety device would not impair the utility of the smaller press, and the court, on appeal, held that the jury could decide whether failure to incorporate that device rendered the smaller press unreasonably dangerous. *Id.*, 60 N.J. at 410–11, 290 A.2d at 285. The court stated that, where a manufacturer introduces a finished product into the marketplace without a feasible safety device, the fact that it expects the purchaser to install that device cannot immunize it from liability. It concluded that the manufacturer should not "leave safety to the haphazard conduct of the ultimate purchaser" and that the only way to ensure use of a needed safety device is to place the duty to install that device upon the manufacturer. *Id.*, 60 N.J. at 410, 290 A.2d at 285.

 The suggested option offer defense thus would not apply to dockboards which are not multi-use and whose functioning is never impaired by the installation of the panic stop device. The fact that installation or standardization of a safety device will cost more money and take more time, thus decreasing sales, should be a factor considered within the balancing approach given to the jury but should not provide an absolute defense for the manufacturer. As respondent notes, such a defense would permit an entire industry to market unreasonably dangerous "stripped down" devices and offer as optional all safety devices. Liability for improper choice of a safety device or failure to purchase a particular safety device would then fall on the purchaser. This result would circumvent the general duty of the manu-

the contrary in this case, we apply the new rule to this case and to all cases decided hereafter.

facturer to provide a reasonably safe design for its products.

4. Appellant contends that the evidence does not support an instruction on express warranty. It claims that the evidence respondent produced on the issue was taken out of context from its advertising materials. It argues further that the purchaser, Rauenhorst, knew of the hazard addressed by the panic stop and knew that it was buying a dockboard without that option. We note that the complaint in this case was based in part upon an allegation of breach of an express warranty. On retrial an instruction on express warranty should be given only if the trial court finds that the evidence supports the giving of such an instruction and if, on the verdict form, a special interrogatory is submitted to the jury on that issue.

5. Appellant argues further that McGrath's "gross negligence" and violations of regulations under the Occupational Safety and Health Act (OSHA) by Safelite required a jury instruction on superseding cause (JIG II 142). Respondent answers that such misconduct was foreseeable by Kelley and thus cannot constitute superseding cause.

A defendant is liable, despite an intervening cause, if the cause is foreseeable. W. Prosser, Handbook of the Law of Torts § 44 at 272 (4th ed. 1971). Appellant describes the intervening causes in this case, however, as malicious (McGrath's conduct) and criminal (OSHA violations). The claims are without merit. First, there is no evidence on the record to support the contention that McGrath willfully caused this accident or that he even knew the dockboard would fall below level (evidenced by his remaining on the forklift during the pullout).

Second, OSHA violations cannot be considered superseding causes which relieve a manufacturer of its duty to

produce a safe product. Appellant's Quality Control manager wrote an article for an industrial magazine which stated that, because of high employee turnover, it was "difficult to assure that necessary safety education is being accumulated and retained." Clearly, OSHA violations in these circumstances were reasonably foreseeable and thus do not constitute superseding cause under *Ruberg v. Skelly Oil Co.,* 297 N.W.2d 746, 750 (Minn.1980).[5]

As respondent urges, the negligence of McGrath and the violations of OSHA should not preclude recovery as a matter of law. Rather, they are adequately taken into consideration in the comparative-fault formula, Minn.Stat. § 604.01 (1982). In this case, the jury's verdict, apportioning 40% liability to Safelite, properly reflected the negligence of Safelite and its employees.

6. Appellant next challenges the sufficiency of the evidence on the element of causation. On retrial, the trial judge will have to determine whether there is sufficient evidence to submit the causation question to the jury. We can only state, on the record before us, that there was sufficient evidence to submit the question to the jury in this case.

7. Appellant claims that the verdict is irreconcilable in that the jury found Pugleasa at fault without finding Rauenhorst and ELCA negligent as well. We need not address this issue, since on retrial the negligence of all defendants will be submitted to the jury.

We reverse the order of the trial court and remand for a new trial on the issue of liability.

Reversed and remanded.

SIMONETT, Justice (concurring specially).

In a design defect case, I do not think it can be said that either negligence or strict

**5.** The Third Circuit has ruled that state safety regulations violations do not relieve a manufacturer of section 402A liability as a matter of law but are merely evidence to put before a jury.

*Heckman v. Federal Press Co.,* 587 F.2d 612, 616–17 (3d Cir.1978), *cited with approval* in *Johnson v. Niagara Machine & Tool Works,* 666 F.2d 1223, 1226 (8th Cir.1981.)

liability is "broader" than the other. The most that can be said is that, depending on the facts of a particular case, the proof needed to survive a defendant's motion for directed verdict may vary, so that one theory is "better" than the other for purposes of recovery. In other words, the distinctions between strict liability and negligence may be important to the trial court in deciding whether the case goes to the jury, but once the case is submitted, insofar as the jury is concerned, any distinction between strict liability and negligence is nonexistent where the claim is for design defect or failure to warn. For a good discussion, *see* Steenson, *The Anatomy of Products Liability in Minnesota: The Theories of Recovery*, 6 Wm. Mitchell L.Rev. 1 (1980).

The problem then becomes how to submit a design defect to the jury. I agree with the majority opinion that this can be done "on a single theory of products liability." When the claim is design defect, something along the lines of the modified JIG instruction discussed in the majority opinion should suffice. This instruction reconciles the strict liability notion of "defect" with the negligence concept of "reasonable care." One could, I suppose, label this instruction either a negligence or a strict liability instruction because it is something of both.[1]

How the jury instruction is labeled is unimportant except as it bears on how the special verdict question is framed. Actually, the instruction is simply about unsafe design. Thus the special verdict question might be (as a suggestion): "Was the product unsafely designed?" Putting the question this way avoids the label of either strict liability or negligence; at the same time, this wording permits flexibility in drafting the accompanying jury instruction,[2] is understandable to the jurors, and avoids confusion with any other liability questions that might be on the special verdict form.

In most product liability cases, there will be several liability questions. In this case, for example, the claims against the manufacturer include an unsafe design question and a negligence question, with the jury instructed that negligence might be found for failure to warn or failure to instruct. In another case, both of these questions might appear on the special verdict form plus, say, a defective condition question, accompanied by the classic strict liability instruction for a manufacturing flaw in the product. Or the negligence question might be accompanied by an instruction that negligence could be found in failure to inspect

---

1. If plaintiff's claim is for failure to warn or instruct, a separate negligence instruction on this subject will do. Another problem with the case before us is the jury was told that a product could be in a defective condition not only in its design but "in the instructions necessary for its safe use." After the jury was next told that the manufacturer had "a duty to use reasonable care" to give adequate instructions, the trial court went on to give a separate negligence instruction on the manufacturer's "duty to give a reasonable warning" as to dangers inherent in the use of the product. Although appellant does not raise the issue, for the jury, under these instructions, to have found the defendant manufacturer negligent but its product not to be in a defective condition would seem perverse.

To avoid this needless risk of contrariness, the issue of failure to warn or instruct should be removed from any strict liability defective condition instruction and be submitted as a separate negligence issue.

2. If one were to meld strict liability and negligence for unsafe design, a tentative draft of such an instruction, which is a close variation

of the majority's proposal, might be along these lines:

A product is unsafely designed if, by reason of its design, the product is in a defective condition unreasonably dangerous to the user. The manufacturer has a duty to use due care to design a product that does not create an unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is put to its intended use or to any unintended yet reasonably foreseeable use.

The reasonable care to be exercised by a manufacturer in the design of a product will depend on all the facts and circumstances, including, among others, a balancing of the likelihood of harm and the seriousness of that harm against the feasability and burden of any precautions which would be effective to avoid the harm.

This is only a suggestion. The trial bench and bar is best situated to devise the appropriate instructions.

as well as in failure to warn or instruct. To avoid perverse verdicts and to make the issues understandable to jurors, the important thing is to have separate questions on each liability issue and appropriate instructions for each question.

TODD, Justice (concurring specially).

I join in the special concurrence of Justice Simonett.