**HARMON CONTRACT GLAZING, INC., Respondent,**

v.

**LIBBY–OWENS–FORD COMPANY, Appellant.**

**No. C1–92–1115.**

Court of Appeals of Minnesota.

Dec. 15, 1992.

Review Denied Feb. 12, 1993.

Scott P. Drawe, Stich, Angell, Kreidler & Muth, P.A., Minneapolis, for appellant.

John H. Guthmann, Hansen, Dordell, Bradt, Odlaug & Bradt, St. Paul, for respondent.

Considered and decided by PARKER, P.J., PETERSON and AMUNDSON, JJ.

## OPINION

AMUNDSON, Judge.

Respondent commenced this subrogation action against appellant seeking reimbursement of workers' compensation benefits. The jury found appellant negligent in designing the crating, bracing and shoring system used in loading and shipping glass panes to respondent and in failing to warn of the dangers in the handling process. The trial court denied appellant's new trial motion and this appeal followed. We reverse and remand.

## FACTS

Appellant Libby–Owens–Ford Company (LOF) manufactures and sells commercial glass. Respondent Harmon Contract Glazing, Inc. (Harmon) purchased glass from LOF for installation in an office building. LOF packaged the glass panes in wood crates it designed. Each crate contained 20 or 21 glass panes and weighed between 2,500 and 2,650 pounds.

LOF loaded the wood crates vertically onto the bed of a semi-trailer. Wood blocks were used to shore the crates to the floor of the trailer. Two-by-six inch boards were used to brace the crates for shipment. The crates were not individually braced. Instead, four crates at a time were braced together. The shoring and bracing were necessary to protect the glass during shipment. LOF was responsible for choosing the method used to shore and brace the crates.

On February 14, 1983, while employed by Harmon, Bradley Brezinka and Grover Blunt were assigned to unload the glass shipment. Both men had training on safe procedures for loading and unloading glass. Blunt was a journeyman with 25 years experience. Brezinka was an apprentice with several years experience. Harmon did not have a required procedure for unloading because each shipment of glass was different. Instead, the unloaders, through their experience, were to determine the best method of removal. When the truck arrived, Blunt removed the bracing from one set of four crates. He did not use temporary bracing, which was available and often used, to secure the loose crates. A sling was placed around each end of the first crate for removal by an overhead crane. Each crate had to be tipped slightly in order to get the sling around it. Blunt stood in the middle of the crates to reach up for the sling as it returned.

After two crates had been lifted out of the trailer, the remaining two unsecured crates tipped and fell on Blunt as he was reaching for the sling, crushing his chest. As they were falling, the crates caught one of Brezinka's arms and broke it. The crane lifted the crates off Blunt, but he died from his injuries.

Blunt's heirs and Brezinka commenced separate actions against LOF. LOF filed a third-party complaint for contribution against Harmon, the workers' employer at the time of the accident. Brezinka and Blunt settled their claims with LOF pursuant to *Naig v. Bloomington Sanitation,* 258 N.W.2d 891 (Minn.1977). In December 1986, Harmon commenced this subrogation action seeking reimbursement of workers' compensation benefits paid to Brezinka and Blunt's estate.

The testimony at trial centered on LOF's bracing system. Both parties presented evidence about different methods of bracing available in the industry. LOF contended that its method of bracing was safe and customary in the industry. It asserted

that Harmon's employees should have used temporary bracing when they unloaded the crates. Harmon argued LOF was negligent in its design of the crating, bracing, and shoring system. It contended there were safer alternatives available, and LOF should have used them. It also argued that, at the very least, LOF should have warned Harmon of the dangers inherent in the system. Throughout the trial, Harmon focused on the facts that LOF was the manufacturer of the product, that LOF designed the crate and the system used to brace the glass, and that LOF had a duty to provide a product that was safe to unload.

Over LOF's objection, the jury was instructed on negligent design of a product and negligent failure to warn. LOF was found negligent under both theories and ordered to pay damages in the stipulated amount, including prejudgment and postjudgment interest.

## ISSUE

For products liability purposes, does the packaging of a product include the bracing and shoring system used in loading the product for shipment?

## ANALYSIS

■ The trial court determined the crating, bracing, and shoring of the glass panes were an integral part of LOF's product. LOF's duty of care was that of a manufacturer. Thus, the case was tried on products liability theories. Rulings on mixed questions of law and fact are not binding on an appellate court but are subject to independent review. *Meyering v. Wessels*, 383 N.W.2d 670, 672 (Minn.1986).

■ LOF contends this case involves allegations of negligent loading procedures, not the negligent design of a product. We agree and therefore conclude, for purposes of products liability, a product's packaging does not extend to the method used to secure or load it for shipment.

■ A manufacturer has a duty to use reasonable care when designing a product, so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger. *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn.1984). Minnesota has recognized that a design defect may be in the product itself, in its preparation, in its container or packaging, or in the instructions necessary for its safe use. *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984). A product includes its container or package if that container or package is an integral part of the product. *See, e.g., Cerepak v. Revlon, Inc.*, 294 Minn. 268, 270, 200 N.W.2d 33, 35 (1972) (glass deodorant bottle); *Holkestad v. Coca–Cola Bottling Co.*, 288 Minn. 249, 255, 180 N.W.2d 860, 865 (1970) (soft-drink bottle). These decisions are based in part on the idea that:

> No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. * * * The container cannot logically be separated from the contents when the two are sold as a unit.

Restatement (Second) of Torts § 402A, cmt. h (1965).

■ The product here is the glass panes. The product's container could conceivably include the wood crates, since the two were sold as a unit. Harmon maintains the bracing system used by LOF in securing the crates for shipment was part of the product's "package." It further contends the bracing system was defective, which made unloading the semi-trailer unreasonably dangerous. It is evident that the glass panes and wood crates were intended to be sold as a unit. However, the glass and the bracing system were not sold as an integrated whole. Bracing the crates to the semi-trailer was done simply to secure the load for shipping. Any product, whatever its nature, can cause damage by careless handling. While the method used to secure the product for shipment is an essential component in assuring that the product is delivered unharmed, it cannot be interpreted to be an integral part of the product itself.

Harmon argues that LOF's duties equaled those of a product manufacturer because LOF manufactured the glass and wood crates and was personally responsible for loading and shipping the product. Public policy demands that greater duties of care be placed on manufacturers in order to protect consumers from the risks of harm to life and health. One such greater duty is the requirement to keep informed of scientific knowledge and discoveries in its field. 4 *Minnesota Practice,* CIVJIG 119 (1986); *see also Willmar Poultry Co. v. Carus Chem. Co.,* 378 N.W.2d 830, 837 (Minn.App.1985), *pet. for rev. denied* (Minn. Feb. 14, Feb. 19, 1986). By maintaining this information, the manufacturer is in the position to most effectively reduce or eliminate the risk. The consumer normally does not possess the skill or the means necessary to protect himself from injury. *McCormack v. Hankscraft Co.,* 278 Minn. 322, 338, 154 N.W.2d 488, 500 (1967).

Harmon, however, is not in the same position as a typical consumer. Blunt and Brezinka were both skilled and experienced with unloading procedures. The bracing system was not used exclusively by LOF, and Harmon's workers had seen it before. Brezinka testified he previously unloaded crates, similar in size and shape, from various manufacturers that used the same bracing method. The technological information regarding the dangers involved with the bracing system could equally have been obtained by Harmon. In fact, temporary bracing was available and often used by Harmon employees.

In support of its argument, Harmon points to three cases outside this jurisdiction where products liability theories were applicable. In *Lewis v. Stran Steel Corp.,* 57 Ill.2d 94, 311 N.E.2d 128 (1974), bundles of steel flooring were secured by three metal bands. The bands were sold with the flooring. As the bundles were being moved, sheets of steel flooring slid out of the loose bands and injured a worker. The Illinois Supreme Court concluded it was reasonably foreseeable that if the bundle were to become loose, the individual sheets could slide out of the banding and cause injury. *Id.* 311 N.E.2d at 133.

The metal bands in *Lewis* are analogous to the wood crates in this case. Like the metal bands, the wood crates were sold with the product and as part of it. If the crates had been defective, the glass panes could have broken through and caused injury. In *Lewis,* the product was prepared for shipment improperly, not improperly shipped. This case is just the contrary. LOF did not improperly prepare the glass panes for shipment by placing them in wood crates, although it is alleged they were improperly shipped.

*Spellmeyer v. Weyerhaeuser Corp.,* 14 Wash.App. 642, 544 P.2d 107 (1975), *pet. for rev. denied* (Wash. May 25, 1976) is also similar. In *Spellmeyer,* bales of wood pulp were secured by a single metal band. The product was sold with the band attached. The band itself was not found to be defective, but sometimes broke or became loose in the course of normal handling procedures. The issue turned on whether the product manufacturer should have used something other than a single metal band to bind the bales together. *Id.* at 110.

Again, the metal band is analogous to the wood crates in this case. The issue in this case would have been similar to the one in *Spellmeyer* if Brezinka's injuries and Blunt's death had been caused by glass panes breaking out of the wood crate. The wood crates, however, were sufficiently secure to withstand normal handling procedures. The act of securing them together for shipment was simply part of the loading and shipping process.

Finally, Harmon cites *Coca–Cola Bottling Co. v. Reeves,* 486 So.2d 374 (Miss. 1986) which involved an injury that occurred when a cardboard carton holding glass cola bottles broke. The bottler was charged with distributing a defective cardboard carton. We view these facts like the other cases cited by Harmon. The carton in *Reeves* was intended to be sold with the product as a unit. While the wood crates are comparable to the cardboard carton, we cannot liken the bracing system to it. In

the present case, Harmon alleges the negligent manner in which the crates were secured caused the accident.

■ Harmon asserts any error submitting this case to the jury on principles of products liability was harmless because the case was properly presented to the jury on a separate failure to warn theory. We disagree. A product manufacturer is held to a higher duty of care than a loader or shipper of goods. Most significantly, a product manufacturer "may not delegate its duty to design a reasonably safe product." *Bilotta*, 346 N.W.2d at 624. LOF wanted to argue that Harmon, Blunt, and Brezinka were negligent because they failed to utilize safety measures, such as temporary bracing, when unloading the glass. It also wanted to argue that it reasonably relied on Harmon's workers' expertise in the area of unloading. Because of the non-delegable duty rule, LOF was prevented from asserting these arguments.

Our supreme court has stated that such arguments are inconsistent with the manufacturer's duty to produce a safe product, and that the only way to ensure the use of a safety device is to put the duty on the manufacturer to install it. *Id.* Harmon concedes the standards for manufacturers are different by stating that "[a] simple negligence instruction simply does not adequately convey to a jury a packaging manufacturer's standard of care."

■ The question of whether a legal duty to warn exists is a question of law for the court. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.1986). A manufacturer has a duty to warn of dangers where it knew or should have known of the risk or hazard involved. *Id.* Generally, there is no duty to warn of dangers if the user knows or should know of the potential danger presented. *Wiseman v. Northern Pac. Ry. Co.*, 214 Minn. 101, 107, 7 N.W.2d 672, 675 (1943); *see also Lawrence v. Hollerich*, 394 N.W.2d 853, 855 (Minn.App.1986), *pet. for rev. denied* (Minn. Dec. 17, 1986). This is especially true when the user is a professional who should be aware of the characteristics of the product. *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 687 (8th Cir. 1981); *see also Peppin v. W.H. Brady Co.*, 372 N.W.2d 369, 375 (Minn.App.1985).

■ A manufacturer's added responsibility of keeping informed of current scientific knowledge is relevant to whether a manufacturer knew or should have known of the risks in its product. *Willmar Poultry*, 378 N.W.2d at 837. Therefore, the analysis of whether LOF had a duty to warn Harmon in the first place partially depends on whether LOF's duty of care is held at the level of a manufacturer. Although it is possible that the danger presented by the bracing system was foreseeable by LOF, there is also evidence in the record to indicate the danger was or should have been known to Blunt and Brezinka.

Even if the trial court were to determine that LOF had a duty to warn, its failure to warn, outside the realm of products liability, would simply be prima facie evidence of negligence. It would not constitute a theory of liability in and of itself, as it was presented in this case. Once a duty is established, the remaining issues, such as the adequacy of the warning, breach of duty, and causation, are to be resolved by the jury. *See Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987).

■ In a products liability case, not only must the manufacturer warn of the danger, it must also provide adequate instructions for the safe use of the product. *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 787 (Minn.1977). Therefore, even if LOF had provided adequate warnings, it would presumably still be liable because it failed to provide adequate instructions. This burden is only imposed in the area of products liability.

Clearly, a greater duty of care is placed on a manufacturer of products as opposed to a shipper or loader of products. By submitting this case to the jury on products liability theories, LOF was allocated uncompromising duties it would not have had under simple negligence.

## DECISION

We conclude that the trial court erred by submitting this case to the jury on products

liability theories. Because we cannot consider the prejudice suffered by LOF harmless, it is entitled to a new trial based on principles of simple negligence.

Reversed and remanded.