# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-3428

———————

| | |
|---|---|
| Royce Young, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| Pollock Engineering Group, Inc.; | * |
| Pollock Research and Design, Inc.; | * |
| Computech, a sole proprietorship; | * |
| and Lewis L. Deland, an individual, | * |
| | * |
| Appellees. | * |

———————

Submitted: May 9, 2005
Filed: November 15, 2005

———————

Before BENTON, LAY, and FAGG, Circuit Judges.

———————

BENTON, Circuit Judge.

Royce Dale Young was injured while working as a "die man" at Alexandria Extrusion Company (AEC). A die man loads dies into a die changer, here manufactured by Pollock Engineering Group, Inc. A co-employee operates the die changer from a control panel, which was provided by Computech about three years after the installation of the die changer. Once activated, the die changer inserts dies into an extrusion press.

On the night of the injury, Young was loading dies into the die changer while Robbie Joe Betterman operated the control panel. Not intending any harm, Betterman activated the die changer, severely injuring Young's left hand. AEC later installed a "barrier guard" or barrier fence around the die changer.[1]

Invoking diversity jurisdiction, Young sued Pollock for negligence and strict liability in defectively designing the die changer. Young also sued for failure to warn of the dangers associated with the product. The district court granted summary judgment to Pollock, Computech, and Lewis L. Deland on all counts. On appeal, Young attacks the judgment only as to Pollock. This court affirms the summary judgment on the failure-to-warn claim, but reverses as to the defective-design claims.

I.

This court reviews de novo a grant of summary judgment, applying the same standard as the district court. *See Essco Geometric v. Harvard Indus.*, 46 F.3d 718, 729 (8th Cir. 1995). Summary judgment is affirmed where there is no genuine issue of material fact, and judgment is appropriate as a matter of law. *See id.*, *citing* **Fed. R. Civ. P. 56(c)**. This court construes the facts in favor of the non-moving party. *See RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1]The Appellant's Brief violates FED. R. APP. P. 28(a)(7), as it does not cite the Appendix, and rarely references the record. Although this court is not required to search the record, the violations in this case do not prevent review of the arguments presented. *See Lucas v. Lucas*, 946 F.2d 1318, 1325 (8th Cir. 1991).

A plaintiff asserting defective design under Minnesota law must establish that the defendant's product "was in a defective condition unreasonably dangerous for its intended use." *See **Bilotta v. Kelley Co.***, 346 N.W.2d 616, 623 n.3 (Minn. 1984) (en banc), *citing **Lee v. Crookston Coca-Cola Bottling Co**.*, 188 N.W.2d 426, 432 (Minn. 1971). To determine whether there is enough evidence to submit the claim to a jury, the court must balance "the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *See **Bilotta***, 346 N.W.2d at 621, *quoting **Holm v. Sponco***, 324 N.W.2d 207, 212 (Minn. 1982) (en banc). *See generally **Trost v. Trek Bicycle Corp.***, 162 F.3d 1004, 1009 (8th Cir. 1998) (summarizing Minnesota law).

An important factor in this balancing test is the availability of a feasible, safer alternative design. *See **Kallio v. Ford Motor Co.***, 407 N.W.2d 92, 96 (Minn. 1987) (en banc). Only in rare cases do defective-design claims succeed without showing a safer design. *See **id.*** at 97 n.8. "Conceivably, rare cases may exist where the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned." ***Id.*** In Minnesota, "successful plaintiffs, almost without fail, introduce evidence of an alternative safer design." ***Id.*** at 95 n.6 (citing cases).

Young relies on the affidavits of two expert witnesses, both mechanical engineers. Tarald O. Kvalseth, Ph.D., states that a number of feasible, safer designs could have prevented Young's injuries. As an example, Pollock could have installed a barrier guard like the one installed after Young's injuries. Dr. Kvalseth states that the barrier guard could be an effective safety device when used with an "interlock switch" that disables the die changer while the gate to the barrier guard is open. J. Kenneth Blundell, Ph.D., agrees that an alternative design could have prevented Young's injuries. Like Dr. Kvalseth, he proposes a barrier guard with an interlock switch.

Although acknowledging the experts' opinions, the district court granted summary judgment on the defective-design claims. The district court holds:

> [Young] does not contest that his proposed safety enhancements are external work area modifications available for purchase "off the shelf," rather than mechanisms incorporated into the design of the die changer or "permanently attached to" the product. ***Huber v. Niagra Mach. & Tool Works***, 430 N.W.2d 465, 466 (Minn. 1988) (en banc). This fact readily distinguishes the instant case from that relied on by [Young], in which the court found a manufacturer could be liable for defective design based upon exclusion of an integral safety component from some of its models. ***Bilotta***, 346 N.W.2d at 622, 624-25. Young does not suggest or reference an alternative die changer design that includes a safety device, and cites no authority for his proposition that the failure to recommend external safeguards made by different manufacturers can constitute a defect in design. Accordingly, his claim is appropriately one of failure to warn and it will be addressed as such. Summary judgment for Pollock is thus warranted on the issue of defective design.

The district court's reasoning is erroneous in two respects. First, Young did not concede that his proposed modifications should not have been incorporated into the design of the die changer. In written suggestions Young argued: "Plaintiff's experts have identified other feasible safety devices that could have been used to safeguard the Die Changer, and which should have been *incorporated by Pollock in its original design of the product*." (emphasis added). Young restated his position during oral argument in the district court.

Young's position is supported by the affidavits of his expert witnesses, who advocate alternative designs of the die changer itself. In the same sentence where Dr. Kvalseth says that the proposed safety modifications are available "off the shelf," he also states that *Pollock* should have incorporated them into the die-changer design. Dr. Blundell agrees in his affidavit and attached report.

Pollock counters that during his deposition, Dr. Kvalseth agreed: he was not proposing modifications to the functioning or configuration of the "die slide itself"; and, his proposed modifications were not "physically attached" to the die slide. However, Dr. Kvalseth later said in his deposition that industry standards do not permit a manufacturer to "design an extrusion press and just leave out guards." Dr. Kvalseth's deposition, interpreted in Young's favor, says that the die changer itself was unreasonably dangerous.

Dr. Blundell's deposition, interpreted in Young's favor, is to the same effect. Dr. Blundell, after opining that the manufacturer should provide safeguards, testified that Pollock should have examined the die changer for pinch-point hazards and identified the lack of safeguards.

Pollock argues that the experts' testimony is inadmissible because they failed to take measurements to determine the feasibility of the safety modifications they propose. Testimony may be excluded if an expert fails to explain how a proposed safety modification would protect the machine's operators without compromising the machine's utility. *See **Unrein v. Timesavers, Inc.***, 394 F.3d 1008, 1012 (8th Cir. 2005) (holding that the district court properly excluded Dr. Kvalseth's testimony regarding an industrial sander). However, in this case the experts did not need to conduct a detailed feasibility study of the barrier guard because AEC had installed the barrier guard and used it successfully with the die changer. Both experts explained that the barrier guard—used with a simple switch to cut the power to the die changer while the gate of the barrier guard is open—would be an effective safety device. In sum, Young presented admissible evidence supporting his allegation that the die changer itself was defective and unreasonably dangerous. *See **Anderson***, 477 U.S. at 256.

Second, the district court erroneously concluded that Minnesota law recognizes a distinction between external work area modifications and integral safeguards, in design defect cases. For that conclusion, the district court cites *Huber*, which was not a defective design case. Rather, it held that the manufacturer of a component foot switch with a "permanently attached" safety device did not have the duty to warn users that the safety device should not be removed. *See Huber*, 430 N.W.2d at 466.

The closest Minnesota authority is ***Harmon Contract Glazing, Inc. v. Libby-Owens-Ford Co.***, 493 N.W.2d 146, 149 (Minn. Ct. App. 1992), which held that the plaintiff could not recover for defective design of a shipping brace that secured glass panes during transit because the brace was not an "integral part of the product itself." *Id.* Unlike the brace in *Harmon*, the barrier guard Young proposes would have been integrated into the product during its normal use. *See **Cerepak v. Revlon, Inc.***, 200 N.W.2d 33 (Minn. 1972) (deodorant bottle); ***Holkestad v. Coca-Cola Bottling Co. of Minn., Inc.***, 180 N.W.2d 860 (Minn. 1970) (en banc) (soft-drink bottle).

Other than these cases, the distinction – "external" versus "integral" or "internal" – does not appear in the Minnesota cases. In deciding whether summary judgment is appropriate as a matter of law, this court therefore follows the leading case, *Bilotta*, where the Minnesota Supreme Court states that allowing manufacturers to sell products without adequate safety devices would "permit an entire industry to market unreasonably dangerous 'stripped down' devices." ***Bilotta***, 346 N.W.2d at 624. The district court's holding – that Pollock could be liable only for modifications that would have been permanently attached to the die changer – "would circumvent the general duty of the manufacturer to provide a reasonably safe design for its products." *See **Id.*** at 624-625.

In footnote three of its order, the district court states that its conclusion "is bolstered by the American National Standards Institute's assignment to the *employer* of the obligation to provide 'adequate guards, awareness devices, presence-sensing devices, and/or appropriate controls to provide proper protection to operating personnel.,'" quoting ***American National Standard for Machine Tools - Horizontal Hydraulic Extrusion Presses - Safety Requirements for Construction, Care, and Use***, B11.17 § 5.1 (1982) (emphasis in original court order). The district court reasoned that the *manufacturer* does not have to include such safety devices in the product design. This reasoning is contrary to Minnesota law. Although the employer is generally responsible for ensuring worker safety, "a manufacturer may not delegate its duty to design a reasonably safe product." *See **Bilotta***, 346 N.W.2d at 624; ***Gorath v. Rockwell Int'l, Inc.***, 441 N.W.2d 128, 133 (Minn. Ct. App. 1989).

Further – to the extent they are relevant – the district court reads the ANSI standards too narrowly. True, under section 5 of the standards, employers are responsible to provide certain safeguards. *See **American National Standard*** B11.17 § 5.1. Equally relevant is section 3, the ANSI standard entitled "Construction and Modification." ***Id.*** § 3. In contrast to section 5, section 3 describes the responsibility of extrusion press manufacturers. The explanatory notes to section 3 identify certain hazards associated with moving parts, including "pinch points between moving and stationary press components, such as . . . the areas where die carriers . . . are shifted into or out of the press." ***Id.*** § E3.2.1. The explanatory notes to section 3 state: "For those areas requiring access for normal operation, awareness devices, presence sensing devices, interlocked guards, or two-hand controls are some of the safeguards that can be used to satisfy the requirements of Section 3." ***Id.*** As Dr. Blundell testified, the ANSI standards make both the employer and the manufacturer responsible for safety. In sum, the ANSI standards do not bolster the district court's conclusion that the employer alone was responsible to provide the safeguards Young's experts proposed.

-7-

This court also rejects Pollock's related argument that OSHA regulations relieve it of liability for designing a defective product. The regulations do establish safety requirements for employers whose employees use mechanical power presses. *See* 29 C.F.R. § 1910.217. However, OSHA regulations generally "pertain only to employers' conduct," and do not purport to define the obligations of manufacturers. *See **Minichello v. U.S. Indus., Inc.***, 756 F.2d 26, 29 (6th Cir. 1985), *citing **McKinnon v. Skil Corp.***, 638 F.2d 270, 275 (1st Cir. 1981).

In Minnesota, the jury ultimately decides whether the die changer was unreasonably dangerous. *See* **4A *Minnesota Practice***, CIVJIG 75.20 (4th ed. 1999). This court concludes that Young has presented sufficient evidence of a defective design to survive summary judgment. *See **Bastow v. General Motors Corp.***, 844 F.2d 506, 510 (8th Cir. 1988) ("[I]t is not for us to decide whether defendants' or plaintiff's evidence is more persuasive. It is for the jury.")

II.

The district court concluded that Pollock had no duty to warn Young about the potential hazards associated with the die changer because such hazards were open and obvious. The court correctly noted that Young conceded that the pinch-point hazard was obvious and that he had been trained in proper use of the die changer.

Young counters that the danger Pollock should have brought to his attention was not the pinch point, but the possibility that the die changer could be unexpectedly activated. However, Young conceded in his deposition that he did not know of any warnings Pollock could have given that would have prevented the accident. The district court correctly concluded that Young was aware of the potential hazards and that Pollock had no duty to warn him. *See **Dahlbeck v. DICO Co.***, 355 N.W.2d 157,

-8-

163 (Minn. Ct. App. 1984) ("[A] manufacturer has no duty to warn when the dangers of a product are within the professional knowledge of the user."), *quoting* ***Strong v. E.I. DuPont de Nemours Co.***, 667 F.2d 682, 687 (8th Cir. 1981).[2]

III.

The judgment as to the failure-to-warn claim is affirmed. The judgment is reversed as to Young's claims for defective design, and the case remanded.

LAY, Circuit Judge, concurring and dissenting.

I dissent from the majority's opinion that Pollock maintained no duty to warn Young of dangers associated with the unexpected activation of the die changer. In doing so, I concur with the majority opinion that the district court erred by dismissing Young's defective design claim under Minnesota law.

---

[2]For the purpose of the claims for defective design discussed in Part I, the obviousness of the danger created by the product is not a complete bar to recovery, but may be considered in the balancing test and may also be relevant to whether the plaintiff exercised reasonable care in using the product. *See* ***Holm***, 324 N.W.2d at 211-213, *rejecting* ***Halvorson v. American Hoist & Derrick Co.***, 240 N.W.2d 303, 305 (Minn. 1976).

## FAILURE TO WARN

To prevail against a manufacturer on a failure to warn claim, a plaintiff must prove: (1) that the manufacturer failed to warn of a foreseeable danger associated with the use of its product; and (2) causation. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986); *Drager by Gutzman v. Aluminum Indus. Corp.*, 495 N.W.2d 879, 888 (Minn. Ct. App. 1993). It is a question of law whether the danger resulting from the alleged failure to warn was reasonably foreseeable. *Germann*, 395 N.W.2d at 924. If the connection between the event causing the damage and the failure to act is too remote to impose liability as a matter of public policy, then the manufacturer maintains no duty to inform of the alleged danger. *Id.* Similarly, if the danger alleged is "obvious to anyone using the product," then no duty to warn arises. *Mix v. MTD Prods., Inc.*, 393 N.W.2d 18, 19 (Minn. Ct. App. 1986). When assessing the obviousness of the risk of harm, we must determine whether the plaintiff was aware of the specific danger posed by the device. *See Indep. Sch. Dist. No. 14 v. AMPRO Corp.*, 361 N.W.2d 138, 143 (Minn. Ct. App. 1985) (stating that a duty to warn exists where the danger involved is "different, more serious, and more unexpected" than an obvious risk).

In this case, the facts mandate the conclusion that the relationship between Young's injury and Pollock's failure to warn that the die changer might be unexpectedly activated is <u>not</u> too remote to impose liability. Absent a warning, it is foreseeable that Young, as a line employee responsible for the regular operation and replacement of the die changer, might, in a moment of diversion, keep his hand near, next to, or inside the die changer after its deactivation under the belief that the changer was properly turned off. Moreover, there is no record evidence to support the conclusion that the danger of unexpected activation was obvious, or that Young knew of the specific threat that the die changer could be unexpectedly activated.

-10-

The district court's reliance on 29 C.F.R. § 1910.217(c)(1)(i),[3] which places the burden on the employer to provide and insure the proper usage of "point of operation guards" and "point of operation devices" to relieve Pollock of its duty to warn that the die changer could be unexpectedly activated, is misplaced. In its analysis, the district court incorrectly concluded that Pollock's failure to warn of the specific danger of unexpected activation implicates the "external safety devices and controls" referenced in § 1910.217(c)(1)(i). *Young v. Pollock Eng'g*, No. 02-4377, 2004 U.S. Dist. LEXIS 14378, at *12 (D. Minn. July 28, 2004). Under § 1910.217(c)(1)(i),[4] the duty to safeguard points of operation through the use of guards and devices is the responsibility of the employer. *Id.*

Point of operation guards, for their part, "consist of barriers erected to prevent an operator from placing any part of his body in the danger zone of the press." *Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 468 (Minn. 1988) (citing 29 C.F.R. § 1910.217(c)(1)(i)). By contrast, "[p]oint of operation 'devices' protect an operator by forcing [the operator] to manually activate switch controls located away from the danger zone before the press will operate, thus preventing [the operator] from placing parts of his body in the danger zone of the press while it is running."

---

[3]The district court also cited industry-wide safety standards promulgated by the American National Standards Institute ("ANSI") to relieve Pollock of its duty to warn that the die changer could be unexpectedly activated. However, no Minnesota case has employed ANSI standards to define the scope of a product manufacturer's duty to warn of foreseeable dangers associated with the use of its product. *See Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 358 (Minn. Ct. App. 1991) (noting that the trial court, correctly, "did not substitute ANSI and OSHA standards for case law duty analysis").

[4]At least one Minnesota case has applied 29 C.F.R. § 1910.217(c)(1)(i) in the context of a manufacturer's duty to warn of foreseeable dangers associated with the use of a component product. *See Huber v. Niagra Mach. & Tool Works*, 430 N.W.2d 465, 468 (Minn. 1988).

*Id.* Given this framework, an oral or written warning indicating that the die changer could be unexpectedly activated is neither a barrier erected to prevent bodily harm nor a device that forces the operator to manually activate switch controls located away from the zone of danger. As a result, Pollock's duty to warn of the potential for unexpected activation cannot be delegated to Young's employer under § 1910.217(c)(1)(i). As such, Pollock maintained a duty to warn Young of this risk.

## CAUSATION

Turning to the issue of causation, genuine issues of material fact exist regarding whether Pollock's failure to warn of the potential for unexpected activation caused Young's injury. <u>In Minnesota, the question of causation is normally left for the jury</u>. *See, e.g., Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 915 (Minn. 1983). Only where there is "no room for an honest difference of opinion among reasonable people" may courts take an issue of causation away from the finder of fact. *Gum v. Medcalf Orthopaedic Appliance Co.*, 380 N.W.2d 916, 921 (Minn. Ct. App. 1986) (quoting *Johnson v. Evanski*, 22 N.W.2d 213, 215 (Minn. 1946)). This case presents room for honest difference of opinion concerning the cause of Young's injury.

Young was not informed by Pollock of the possibility that the die changer might be unexpectedly activated even though he was the worker assigned to regularly operate, change, and replace the device. A jury might reasonably infer that Young would have exercised greater caution with the die changer, especially considering his frequent contact with the device, if he was informed of the possibility that the changer could be suddenly activated.[5]

---

[5]Many jurisdictions have adopted the principle that if a plaintiff is not warned of a particular risk, a rebuttable presumption arises that a proper warning would have been heeded, thereby establishing causation. *See, e.g., Golonka v. Gen. Motors*

The district court, however, found that Young did not establish causation because a failure to warn " is not the proximate cause of injury if the user is aware of the danger posed by the device at issue." *Young*, 2004 U.S. Dist. LEXIS 14378, at *13 (citing *Holowaty v. McDonald's Corp.*, 10 F. Supp. 2d 1078, 1085 (D. Minn. 1998)). However, this analysis fails because, once again, there is no record evidence to demonstrate that Young knew the die changer could be unexpectedly activated, or that he was warned of the possibility for unexpected activation.

The district court concluded, noting that the "effect of a warning on [Young's] conduct is particularly questionable in light of the fact that he had performed this task many times without incident . . . ." *Id.* at *14. Yet the determination as to how Young may have acted if warned that the die changer could be unexpectedly activated is the very type of fact-intensive inquiry best left for a jury. Therefore, the district court erred when it found there was no genuine issue of material fact on the issue of causation.

SOPHISTICATED INTERMEDIARY DEFENSE

Pollock asserts that even if it maintained a duty to warn Young, this duty was relieved by Alexandria Extrusion Company's ("AEC") status as a sophisticated intermediary. Courts typically apply the sophisticated intermediary defense when: (1) the employer maintained full knowledge of the range of dangers equal to that of

*Corp.*, 65 P.3d 956, 967-72 (Ariz. Ct. App. 2003); *Coward v. Owens-Corning Fiberglas Corp.*, 729 A.2d 614, 621-22 (Pa. Super. Ct. 1999); *Coffman v. Keene Corp.*, 628 A.2d 710, 716-21 (N.J. 1993); *House v. Armour of America, Inc.*, 929 P.2d 340, 347 (Utah 1996). *But see Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 925 (8th Cir. 2004) (stating that, in its view, the court did not think Minnesota "would adopt the rebuttable presumption" in the case presented).

the manufacturer; or (2) the manufacturer made the employer knowledgeable by providing adequate warnings and safety instructions to the employer. *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 277-78 (Minn. 2004). When applicable, the sophisticated intermediary defense permits a manufacturer or distributor to discharge its duty to warn of foreseeable dangers related to the use of its product if the manufacturer or distributor exercised reasonable care in relying upon the intermediary to give a warning to the end user. *See id.* at 278.

Young notes, however, that no Minnesota court has extended the sophisticated intermediary defense to employer/employee relationships and, as a result, the defense has been implicitly restricted in Minnesota. *See id.* (noting that some courts, including the Fifth Circuit and a federal district court in Minnesota, "have been reluctant to extend the rationale of the sophisticated user defense to sophisticated intermediaries").

Given the current state of the law, I agree. The Minnesota Supreme Court's recent reluctance to define the full applicability or scope of the sophisticated intermediary defense, *id.* at 278-79, coupled with the infrequency with which the defense is applied by other jurisdictions in the employer/employee context, suggests that the sophisticated intermediary defense does not apply to this case.

Even if the defense was applicable, Pollock has failed to show that it exercised reasonable care in relying upon the AEC to give a warning to end users. Pollock is able to reference no record evidence that Pollock actually warned AEC of the danger for unexpected activation, or that it acted in a manner reasonably calculated to assure that AEC might be made aware of the danger that the die changer could be unexpectedly activated. *See id.* at 278 (stating that, when determining if the supplier exercised reasonable care, courts look to "whether the supplier acted in a manner

-14-

reasonably calculated to assure [] that the necessary information would be passed on to the ultimate handlers of the product").

Young's resulting injury was a foreseeable consequence of Pollock's failure to warn about the risk of, and potential for, unexpected activation.  Moreover, causation was certainly a jury question and should not be ruled upon under summary judgment.  Accordingly, I would reverse on both the failure to warn and defective design claims and remand for trial.

_____